UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                        :

ELSEVIER, INC.,                :
                        :

                Plaintiff,    :

                        :

           v.          :

                        :

PIERRE GROSSMAN, *et al.*,    :
                        :

                Defendants. :

                        :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 5, 2015

12 Civ. 5121 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      From 2003 to 2011, Defendants Pierre Grossman ("Grossman"), IBIS Corp. ("IBIS"), Publicações Técnicas Internacionais ("PTI"), and various "John Doe" Defendants (collectively, "Defendants") purchased subscriptions from Plaintiff Elsevier, Inc. ("Plaintiff" or "Elsevier"), a publisher of scientific, technical, and medical journals.  Defendants allegedly purchased 50 of these subscriptions at low-priced, "individual" subscription rates, while promising that they would not resell the subscriptions to entities that would otherwise pay Elsevier's higher, "institutional" subscription rate.  Despite this representation, Defendants allegedly did just that.  On June 29, 2012, Elsevier initiated the instant action, bringing civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1964(c), as well as claims under New York law, stemming from Defendants' alleged subscription fraud.  Defendants have moved to dismiss the Amended Complaint for lack of personal jurisdiction and for failure to state a claim.  For

the reasons discussed in the remainder of this Opinion, Defendants' motion is granted in part and denied in part.

## BACKGROUND

The Court assumes familiarity with the facts and procedural history set forth in its prior decision denying Plaintiff's motion for default judgment and granting Plaintiff leave to amend the Complaint, *Elsevier, Inc.* v. *Grossman*, No. 12 Civ. 5121 (KPF), 2013 WL 6331839 (S.D.N.Y. Dec. 5, 2013), as well as the Court's rulings therein. For convenience, the particular facts relevant to this motion are set forth below.

### A.    Factual Background[1]

Plaintiff Elsevier is a Delaware corporation with a principal place of business in New York. (Am. Compl. ¶ 6). Elsevier publishes scholarly books and journals related to natural and social sciences. (*Id.* at ¶ 10). Defendant Grossman is a citizen and resident of Brazil, and the Chief Executive Officer of

---

[1]    The facts contained in this Opinion are drawn from the Amended Complaint ("Am. Compl.") (Dkt. #33), and are taken as true for purposes of the pending motion. *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). "[B]ecause a motion to dismiss for lack of personal jurisdiction requires the resolution of factual issues outside the pleadings, the Court considers other relevant submissions from the parties at this stage." *Clopay Plastic Products Co.* v. *Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262 (JPO), 2014 WL 4473352, at *1 (S.D.N.Y. Sept. 11, 2014); *accord Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (per curiam) ("[W]e have made clear that a district court may [consider materials outside the pleadings] without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment."). Specifically, the Court will consider the Declaration of Pierre Grossman in Support of Defendants' Motion to Dismiss ("Grossman Decl."); and the Declaration of Jason L. Jurkevich in Opposition to Defendants' Motion to Dismiss ("Jurkevich Decl."), as well as the exhibits to these declarations. For convenience, Defendants' opening brief is referred to as "Def. Br."; Plaintiff's opposition brief as "Pl. Opp."; and Defendants' reply brief as "Def. Reply."

PTI and IBIS. (*Id.* at ¶ 13). He owns an apartment in Garden City, New York, which he visits once or twice a year and uses in connection with various business ventures. (Jurkevich Decl., Ex. B ¶¶ 4-5 (Affidavit of Pierre Grossman)). Defendant PTI is a corporation organized under the laws of Brazil, with a principal place of business in Brazil. (Am. Compl. ¶ 11). Defendant IBIS is a corporation organized under the laws of Brazil, with a principal place of business in Brazil, and an office — Grossman's apartment — in Garden City, New York. (*Id.* at ¶ 12). Plaintiff also brought claims against John Doe Nos. 1-50, who are described, in part, as relatives and/or business associates of PTI, IBIS, or Grossman. (*Id.* at ¶ 14).

### 1. Elsevier's Business Model

Elsevier publishes journals consisting primarily of peer-reviewed articles, which are written by scholars and often based upon original research. (Am. Compl. ¶ 15). Elsevier is the sole source for new copies of its journals. (*Id.* at ¶ 18). Elsevier incurs substantial costs in copyediting, proofreading, typesetting, printing, binding, distributing, and marketing the journals, and in maintaining its editorial offices. (*Id.* at ¶ 16).

Elsevier sells its journals through annual subscriptions — either directly or through subscription agents. (Am. Compl. ¶¶ 17, 20). Subscription agents serve as intermediaries between individuals or institutions and Elsevier. (*Id.*). Elsevier charges two different subscription rates: a full-price rate for institutions, and a discounted rate for individuals. (*Id.*).

3

Elsevier does not permit individuals who purchase journals at the individual rate to then supply them to unidentified institutions for institutional use. (Am. Compl. ¶ 19). To that end, Elsevier provides its subscription agents with terms and conditions that require the agent to identify the end-user of each journal. (*Id.* at ¶ 21). Specifically, Elsevier alleges that each direct customer and agent "represents and warrants" that it is purchasing the subscription from Elsevier

> for its own account and use and not on behalf of any other person or entity. If Client is an agent, it represents and warrants that it is purchasing the Products and Services from Elsevier for the account and use of no more than one identified institutional subscriber as principal or, if the agent is permitted to order personal subscriptions in a representative capacity, for the account and use of no more than one identified eligible individual subscriber for valid personal use.

(*Id.* at ¶ 22).

Elsevier relies upon the income from the institutional subscriptions to make its journals economically feasible. (Am. Compl. ¶ 17). As such, Elsevier suffers financial injury if it receives payment for institutional subscriptions at individual rates. (*Id.* at ¶ 23). A significant decline in income from its journals could cause Elsevier to stop publishing one or more journals, or publish less information in those journals. (*Id.*). Elsevier asserts that such consequences could adversely impact scholarship and scientific progress. (*Id.*).

Elsevier maintains records of each individual and institutional customer in order to provide customer support, pay royalties, and enhance its products for certain markets. (Am. Compl. ¶ 18). According to Elsevier, the loss of

customer information — that is, the information about the ultimate end-users of its journals — irreparably harms Elsevier.  (*Id.*).

## 2.    Defendants' Alleged Subscription Fraud

Elsevier alleges that Defendants engaged in a fraud by conspiring to purchase individual subscriptions from Elsevier at discounted rates and then resell those subscriptions to institutions at the higher rate, thereby reaping substantial illegal profits while depriving Elsevier of revenue and customer information.  (Am. Compl. ¶ 25).  Specifically, Elsevier alleges that Grossman conspired with others, identified in the Complaint as John Doe Nos. 1-50, who are relatives and/or business associates of Defendants PTI, IBIS, or Grossman (the "Subscribing Defendants").  (*Id.* at ¶¶ 14, 26).  The Subscribing Defendants, who are from various states, subscribed to certain journals published by Elsevier at individual rates between 2003 and 2011.  (*Id.* at ¶ 27).  The Subscribing Defendants obtained the journals through the mail and interstate wires, and caused PTI and IBIS to resell them to institutions at substantially higher rates.  (*Id.*).  Grossman also resold the individual-rate journals to institutions at the institutional rate.  (*Id.* at ¶ 28).

According to the Complaint, the Subscribing Defendants and Grossman placed orders for individual subscriptions using "false names and/or addresses."  (Am. Compl. ¶ 29).  Plaintiff further alleges "[u]pon information and belief" that each of the Defendants "misrepresented to Elsevier that each of the individual subscriptions was for the account and use of no more than one

identified eligible individual subscriber for valid personal use." (*Id.* at ¶ 32). The Subscribing Defendants and Grossman then sent journals to several common addresses, including addresses in Garden City, New York, and São Paolo, Brazil. (*Id.* at ¶ 30). Each of the Defendants shared in the profit from this scheme. (*Id.* at ¶ 33).

Critical to the analysis that will follow, Plaintiff also attached as an exhibit to the Amended Complaint a chart listing information regarding 50 subscription orders placed by or on behalf of Defendants, which includes the name of the journals, the quantity of subscriptions ordered, the date of the subscriptions, the billing address, the individual customer names, and the mailing addresses provided for each subscription. (Am. Compl. ¶ 31 & Ex. A).[2]

Most of the journal recipients appear to be individuals, with a few notable exceptions. The first of the 50 orders that were part of the alleged subscription fraud scheme was an order for the Journal of Health Economics placed on or about February 6, 2004. (Am. Compl., Ex. A).[3]  The order was

---

[2]     Plaintiff attached a slightly less detailed version of this chart in support of its Motion for Default Judgment, presumably for the purpose of identifying its damages. (*See* Dkt. #15, Ex. A).  When granting Plaintiff leave to replead, the Court noted that this chart "would have been more helpful had it been attached to the Complaint" because it "identifies all journals at issue," and "identifies the 'speaker' of each false statement, i.e., the Defendant who purchased the subscription."  *Elsevier*, 2013 WL 6331839, at *10 n.8.  Plaintiff has taken the Court's not-so-subtle hint, and attached this chart as an exhibit to the Amended Complaint.  Additionally, Plaintiff's amended chart sought to remedy a flaw identified by the Court — that the chart "does not identify the date each subscription was purchased," *id.* — by adding a column entitled "Invoice Date/Order Process Date" (Am. Compl., Ex. A).

[3]     The date provided by Plaintiff refers either to the date the order "was processed in Elsevier's systems" or to a date no later than 24 hours after the order was processed when "the invoice for the [order] was generated." (Am. Compl., Ex. A).  Elsewhere in the

billed to an address in Brazil associated with IBIS and PTI.  (*Id.*).  The customer

mailing address associated with this order, and with five other orders for this

journal placed from 2004 to 2007, was "Inst Pesquisa Econ Aplicada,

Biblioteca-M Emilia Velga."  (*Id.*).  Whereas other customers on the list — such

as Defendant Grossman — are classified as "Non Inst[itutional] Print

Customers," this particular customer is identified as a "Brazilian Inst[itution]

[of] Applied Econ[omic] Res[earch]."  (*Id.*).[4]  The other orders listed on the chart

were billed to Grossman or to the Subscribing Defendants, and mailed to

addresses in Brazil or to Grossman's Garden City address.  (*Id.*).

### 3. Plaintiff's Discovery of the Alleged Subscription Fraud

In order to detect subscription fraud, Plaintiff uses the services of a

consultant who "analyzes vast amounts of individual rate subscription data to

identify unusual patterns indicative of fraud."  (Am. Compl. ¶ 34).[5]  According

to Plaintiff, "[p]atterns indicative of fraud include, but are not limited to,

unusually large numbers of individual subscriptions, many times in unrelated

fields, ordered in the same person's name, or an unusually large number of

---

Complaint, Plaintiff alleges that Defendants' scheme began in 2003 (*id.* at ¶ 59), but it is unclear that any of the orders listed in Plaintiff's chart were placed as early as 2003.

[4]     This information is contained in Column H of Plaintiff's chart, which bears the heading, "Customer HQ Description."  (Am. Compl., Ex. A).  Plaintiff does not provide an explanation of this column, but it appears to be used — in some, but not all, cases — to categorize customers by type.  That said, some entries in this column appear blank, and others contain the notation "Unassigned Addresses."

[5]     Allegations related to Plaintiff's discovery of the alleged fraud were added to the Amended Complaint in an effort to plead the timeliness of RICO claims.  *See Elsevier*, 2013 WL 6331839, at *7 ("Plaintiff brought this action in 2012, but failed to allege when it first discovered the subscription fraud.").

subscriptions ordered from, or delivered to, the same address." (*Id.* at ¶ 35). Plaintiff further asserts that "[b]ecause the patterns of fraud are based on numerous subscriptions made over time, even through the exercise of due diligence, the patterns may not be discovered until years after the subscriptions are placed." (*Id.* at ¶ 36).

In November 2009, Elsevier's consultant became aware of suspicions by another publisher client regarding individual rate subscriptions ordered by Grossman, PTI, and IBIS from that publisher. (Am. Compl. ¶ 37). One year later, in November 2010, Elsevier's consultant identified a pattern of overlapping individual names, mailing addresses, and e-mail addresses in individual rate subscriptions of Elsevier journals involving PTI, IBIS, Grossman, and other individuals. (*Id.*).

**B.    Procedural Background**

Plaintiff filed the instant action on June 29, 2012. (Dkt. #1). On December 5, 2013, the Court denied Plaintiff's motion for default judgment and granted leave to amend the Complaint. *Elsevier*, 2013 WL 6331839, at *14. On February 4, 2014, Plaintiff filed its Amended Complaint, which included more specificity regarding the subscription orders that were part of the alleged scheme and Elsevier's discovery of the alleged scheme. (Dkt. #33). Following a pre-motion conference on April 11, 2014, Defendants filed their motion to dismiss on May 20, 2014 (Dkt. #39); Plaintiff filed its opposition on June 16,

2014 (Dkt. #41); and Defendants filed their reply brief on June 27, 2014 (Dkt. #43). The Court now considers Defendants' motion.

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester*, 722 F.3d at 84-85 (citation omitted); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (citation omitted)). All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations

omitted); *accord Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding a motion to dismiss for lack of personal jurisdiction must engage in a two-part analysis. First, the court must establish whether there is "a statutory basis for exercising personal jurisdiction," *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013); second, the court must decide whether the exercise of jurisdiction comports with due process, *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 224 (2d Cir.) (per curiam), *cert. denied*, 134 S. Ct. 2888 (2014). In part one of the analysis, the court "applies the forum state's personal jurisdiction rules" unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted).

### 2.    Motions to Dismiss for Failure to State a Claim

Defendants have also moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering this motion, the Court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber*, 648 F.3d at 104 (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009). A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atl. Corp.* v. *Twombly*, 550 U.S. 544, 569 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Hennenman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation omitted); *see also Harris* v. *Mills*, 572 F.3d 66 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted)).

## B.   Analysis

### 1.   Defendants' Motion to Dismiss for Lack of Personal Jurisdiction Is Denied

Defendants concede that IBIS is subject to this Court's jurisdiction, but argue that neither RICO nor New York's long-arm statute allows the Court to exercise personal jurisdiction over PTI or Grossman.  (Def. Br. 4-7; Def. Reply 2-6).  Defendants additionally argue that the assertion of jurisdiction over PTI and Grossman would be inconsistent with principles of due process. (Def. Br. 7-8; Def. Reply 6-7).  Plaintiff contends that RICO's jurisdictional provisions and the New York's long-arm statute each provide a sound basis for

this Court's exercise of jurisdiction.  (Pl. Opp. 6-13).

Although Plaintiff is mistaken as to the application of the RICO jurisdictional provision under these circumstances, the Court agrees with Plaintiff that PTI and Grossman are subject to the Court's jurisdiction under various prongs of New York's long-arm statute, and that exercising such jurisdiction would comport with due process.

### a.    RICO Jurisdiction

As an initial matter, Plaintiff's reading of 18 U.S.C. § 1965, which provides that an action may be brought in any district in which at least one defendant "resides, is found, has an agent, or transacts his affairs" stretches the extraterritorial reach of RICO's jurisdictional provision too far.[6]  Plaintiff argues that as long as one Defendant — in this case, IBIS — is subject to the Court's jurisdiction, the Court may properly maintain jurisdiction over all other Defendants — in this case, PTI and Grossman — so long as no other district court could exercise personal jurisdiction over the entire group.  (Pl. Opp. 7 (citing *Elsevier Inc.* v. *W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 314-15 (S.D.N.Y.

---

[6]      The statute provides in relevant part:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965.

2010)).  Plaintiff is correct that RICO includes a provision that allows a district court to exercise jurisdiction over parties who otherwise could not be brought before the court.  *PT United Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998) ("[Section] 1965(b) provides for nationwide service and jurisdiction over 'other parties' not residing in the district," upon "a showing that the 'ends of justice' so require.").  But a district court relying on § 1965 may only exert this jurisdictional pull over defendants "residing in any other district," 18 U.S.C. § 1965(b), not foreign defendants.

Instead, "[p]laintiffs asserting RICO claims against foreign defendants must rely on the long-arm statute of the state in which they filed suit." *Laborers Local 17 Health & Ben. Fund* v. *Philip Morris, Inc.*, 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998); *accord First Capital Asset Mgmt., Inc.* v. *Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392 (S.D.N.Y.), *aff'd sub nom. First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); *see also Biofeedtrac, Inc.* v. *Kolinor Optical Enterprises & Consultants, S.R.L.*, 817 F. Supp. 326, 332 (E.D.N.Y. 1993) ("[T]he court may exercise personal jurisdiction in a civil RICO action over a foreign defendant if (i) the defendant is served within the United States and such exercise of jurisdiction satisfies federal due process requirements, or (ii) the defendant is served without the United States and such exercise of jurisdiction satisfies both federal due process requirements

and the forum state's jurisdictional requirements.").[7]  Accordingly, because

Plaintiff seeks to bring before the Court two defendants who do not "resid[e] in

any other district," 18 U.S.C. § 1965(b) — a feat that RICO's jurisdictional

provision cannot accomplish under these circumstances — the Court will

examine personal jurisdiction under New York's long-arm statute.

### b.  Specific Jurisdiction Under N.Y. C.P.L.R. § 302

Plaintiff contends that Defendants are subject to this Court's jurisdiction

pursuant to each of the four prongs available under N.Y. C.P.L.R. § 302(a).  (Pl.

Opp. 7-12).[8]  Under C.P.L.R. § 302(a), a court may exercise personal

jurisdiction over any non-domiciliary who, either "in person or through an

---

[7]     The Court is mindful that "[t]he Second Circuit's ... interpretation [in *PT United*] of 1965(b) as providing for jurisdiction over additional parties not residing in the district if the ends of justice require, would seem to permit the assertion of personal jurisdiction over RICO defendants residing abroad."  *Nat'l Asbestos Workers Med. Fund* v. *Philip Morris, Inc.*, 86 F. Supp. 2d 137, 140 (E.D.N.Y. 2000) (internal citations and quotation marks omitted).  However, under those circumstances, "such defendants must be served with process within the United States."  *Id.* (collecting cases).  Plaintiff does not argue that this happened here.  Instead, the parties stipulated as to the service of the Summons and Complaint on Defendants "without prejudice to any of [the Defendants'] right to challenge this Court's personal jurisdiction over them."  (Dkt. #5).  Moreover, the cases Plaintiff cites to support its position that RICO provides an independent basis for personal jurisdiction over PTI and Grossman are inapposite, as the defendants in those cases "resided" within the United States.  *See W.H.P.R.*, 692 F. Supp. 2d at 313 (denying motion to dismiss based on personal jurisdiction where defendants lived in Indiana); *First Cent. Sav. Bank* v. *Meridian Residential Cap.*, No. 09 Civ. 3444 (DLI), 2011 WL 838910, at *10 (E.D.N.Y. Mar. 3, 2011) (denying motion to dismiss made by defendant residing in Florida).

[8]     The Court notes briefly, for the sake of completeness, that neither party addresses whether this Court can exercise *general* jurisdiction over PTI or Grossman under N.Y. C.P.L.R. § 301.  The reason for this is obvious: "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 760 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 131 S. Ct. 2846, 2853 (2011).  Grossman is a resident of Brazil, and PTI — incorporated and having a principal place of business in Brazil — cannot be deemed "at home" in New York.  (*See* Am. Compl. ¶¶ 11, 13).

14

agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state."  N.Y. C.P.L.R. § 302(a)(1)-(4).  The Court will address of these subsections in turn.

### i.      Section 302(a)(1)

Defendants argue that N.Y. C.P.L.R. § 302(a)(1) does not allow this Court to exercise personal jurisdiction over PTI or Grossman because neither transacts business within New York.  (Def. Br. 5)  The crux of their argument is that — at most — "Grossman placed orders over the telephone for periodical subscriptions from Elsevier, which happens to conduct business in New York." (*Id.*).  Plaintiff responds that personal jurisdiction is proper because some of the subscriptions by Defendants ordered as part of the alleged scheme were delivered to an address in New York, and, as an independent basis, because IBIS's transactions within New York should be imputed to PTI and Grossman under an agency theory.  (Pl. Opp. 9-12)  Construing the facts in the light most

favorable to Plaintiff, as the Court must at this stage, the Court agrees with Plaintiff.

First, the Amended Complaint adequately alleges that PTI and Grossman transacted business in New York and that this business is directly related to the instant dispute.  Although Grossman's Declaration indicates that "only IBIS … performs any business operations in New York," it also indicates that Grossman and PTI "have ordered hundreds of subscriptions from Elsevier Inc. for their own use or for the use of various Brazilian customers." (Grossman Decl. ¶¶ 6-7).  Moreover, some of the subscriptions alleged to be part of the fraudulent scheme were billed to PTI and Grossman, and were delivered to Grossman's address in New York.  (Am. Compl., Ex. A).  "[C]ourts have explained that section 302 is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Chloe* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (internal quotation marks omitted).  In the instant case, Plaintiff has alleged that at least one of the subscriptions purchased by PTI and at least one of the subscriptions purchased by Grossman were mailed to New York.  (*See, e.g.*, Am. Compl., Ex. A at Row 12, 25).  As these are two of the subscriptions in the allegedly fraudulent scheme, the mailing of these journals is directly related to Plaintiff's claim.  Accordingly, Plaintiff has put

16

forth a prima facie case that personal jurisdiction over PTI and Grossman exists pursuant to N.Y. C.P.L.R. § 302(a)(1).  *See Baron Philippe de Rothschild, S.A.* v. *Paramount Distillers, Inc.*, 923 F. Supp. 433, 436 (S.D.N.Y. 1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

Second, even if PTI and Grossman had not transacted business directly within New York, Plaintiff has made a prima facie showing that the Court may exercise personal jurisdiction over PTI and Grossman because they "transact[ed] business" in New York "through an agent."  N.Y. C.P.L.R. § 302(a)(1).  Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state … with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit."  *Retail Software Servs., Inc.* v. *Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988); *see also Kreutter* v. *McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).  Here, Plaintiff has sufficiently alleged that IBIS acted with the consent and knowledge of PTI and Grossman, that PTI and Grossman benefited from IBIS's activities, and that they exercised control over IBIS.  (*See* Am. Compl. ¶¶ 13, 25-31). Significantly, by Grossman's own account, all of the transactions alleged to be part of the fraudulent scheme were "purchased and paid for by IBIS" — even those billed to or mailed to the addresses of PTI and Grossman.  (*See*

17

Grossman Decl. ¶ 8).  Accordingly, the subscriptions billed to PTI or Grossman that were in fact "purchased and paid for by IBIS" make plausible the allegation that IBIS acted with consent and knowledge of PTI and Grossman, and that PTI and Grossman exercised control over IBIS.  In the same vein, Plaintiff has sufficiently demonstrated that PTI and Grossman benefited from IBIS's activities by alleging that some of the subscriptions "purchased and paid for by IBIS" were delivered to PTI's and Grossman's mailing addresses.

### ii.      Section 302(a)(2)

Section 302(a)(2) permits the Court to exercise jurisdiction over an out-of-state defendant if a plaintiff has alleged tortious conduct occurring within New York.  Under a similar theory of agency, the Court finds that it has jurisdiction over PTI and Grossman under § 302(a)(2), based on the actions of IBIS within New York.

A "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez* ("*Bank Brussels I*"), 171 F.3d 779, 790 (2d Cir. 1999).  Despite Defendants' arguments to the contrary, the Amended Complaint sufficiently alleges torts under New York law committed "within" New York — namely, that IBIS committed torts of fraud and conversion while present in New York.  (*See* Am. Compl. ¶¶ 12, 69-75, 87-89).  For jurisdictional purposes, IBIS's allegedly tortious conduct can be imputed to PTI and Grossman exactly as it was in the context of the § 302(a)(1) analysis.  *See Emerald Asset Advisors, LLC* v.

18

*Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012) ("[P]ersonal jurisdiction under Section 302(a)(2) may also be predicated on acts taken by an agent."); *accord Courtroom Television Network* v. *Focus Media, Inc.*, 695 N.Y.S.2d 17, 19 (1st Dep't 1999).

### iii.      Section 302(a)(3)

Next, to the extent Plaintiff alleges tortious conduct that occurred outside New York, the Court is unable exercise jurisdiction over PTI or Grossman under § 302(a)(3) because Plaintiff has not alleged that the resulting injury took place within New York.  When evaluating personal jurisdiction under § 302(a)(3), courts apply a "situs-of-injury test, which asks them to locate the original event which caused the injury."  *Bank Brussels I*, 171 F.3d at 791 (internal quotation marks omitted).  "[T]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff."  *Mareno* v. *Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990) (internal quotation marks omitted).  "[H]arm to a business in the New York market through lost sales or lost customers" may meet the requirement of injury in the forum state, *Energy Brands Inc.* v. *Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) (internal citation omitted), but "those lost sales must be in the New York market, and those lost customers must be New York customers," *Darby Trading Inc.* v. *Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 336 (S.D.N.Y. 2008).

The Court is unable to determine that "the situs of the injury" is in New York. The Amended Complaint contains no allegations regarding sales to New York customers, or potential losses to those customers. Accordingly, the Court cannot exercise personal jurisdiction pursuant to § 302(a)(3).

### iv.        Section 302(a)(4)

Finally, the Court finds it cannot exercise personal jurisdiction over Grossman under § 302(a)(4). Plaintiff's basis for jurisdiction under this subsection is that Grossman owned an apartment in New York where Elsevier sent some of the subscriptions. (*See* Pl. Opp. 15). Defendants argue — and the Court agrees — that this cannot suffice.

Under § 302(a)(4), it is not enough for the property to be related in some way to the parties' dispute; the plaintiff's "cause of action [must] arise[] out of the fact of ownership, use or possession of New York realty." *Tebedo* v. *Nye*, 256 N.Y.S.2d 235, 236 (N.Y. Sup. Ct. 1965); *see also Lancaster* v. *Colonial Motor Freight Line, Inc.*, 581 N.Y.S.2d 283, 288 (1st Dep't 1992) ("[Section § 302(a)(4)] requires a relationship between the property and the cause of action sued upon.").[9] Critically, the causes of action in this case, which concern an allegedly fraudulent scheme, do not derive from — and thus can be maintained irrespective of — Grossman's ownership, possession, or use of the

---

[9]       The Court notes that Plaintiff was unable to cite to any analogous cases to support the exercise of jurisdiction under § 302(a)(4). (*See* Pl. Opp. 11-12). This is not entirely surprising as § 302(a)(4) "has generated few cases." David D. Siegel, NEW YORK PRACTICE § 89 (5th ed. 2014).

apartment in New York.  Although Grossman's ownership and use of property in New York has some relevance for jurisdictional purposes, *see* Discussion Sec. B(1)(c), *infra*, it is not a fact sufficient to confer jurisdiction upon the Court under § 302(a)(4).

### c.    Due Process Considerations

Having determined that New York's long-arm statute allows the Court to exercise jurisdiction, the Court must now determine whether jurisdiction over PTI and Grossman satisfies the constitutional requirement of due process. There are two parts to the due process test for personal jurisdiction: the "minimum contacts" inquiry and the "reasonableness" inquiry.  *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez* ("*Bank Brussels II*"), 305 F.3d 120, 127 (2d Cir. 2002).  The minimum contacts inquiry requires that the Court determine whether a defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction over the defendant.  *See Daimler*, 134 S. Ct. at 754 (citing *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945)).  In determining whether minimum contacts exist, courts must examine the "quality and nature" of the contacts under a totality of circumstances test, to determine whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws ... such that [the defendant] should reasonably anticipate being haled into court there."  *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger*

21

*King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474-75 (1985)) (internal citations omitted).

With respect to Grossman, the exercise of jurisdiction would not violate due process.  He has the requisite "minimum contacts" with New York because he owns an apartment in New York, which he visits once or twice a year, and which he uses for several of his business ventures.  (*See* Jurkevich Decl., Ex. B ¶¶ 4-5 (Affidavit of Pierre Grossman)).  *See also Bank Brussels II*, 305 F.3d at 128 (finding "minimum contacts" with New York satisfied where, *inter alia*, defendant "maintained an apartment in New York at least partially … for the purpose of better servicing its New York clients").

Nor would the exercise of jurisdiction over PTI violate due process.  *See Rainbow Apparel Distribution Ctr. Corp.* v. *Gaze U.S.A., Inc.*, 295 F.R.D. 18, 27 (E.D.N.Y. 2013) ("Asserting jurisdiction over [defendant] on a theory of agency does not offend notions of fair play and substantial justice.").  Plaintiff made a prima facie showing that PTI transacted business in New York through the acts of its putative agent, IBIS.  IBIS purposefully directed itself to New York by purchasing subscriptions in New York, some of which were delivered to New York addresses, and Plaintiff's suit arises directly from these very contacts with New York.  *See Donini Int'l, S.p.A.* v. *Satec (U.S.A.) LLC*, No. 03 Civ. 9471 (CSH), 2004 WL 1574645, at *6 (S.D.N.Y. July 13, 2004) ("[Defendant] intentionally mailed its magazine to a list of recipients in New York.  In choosing to do so,

22

[Defendant] should have foreseen the possibility of being haled into court in New York.").  Accordingly, the requisite minimum contacts are demonstrated.

The exercise of jurisdiction over PTI and Grossman would also be reasonable.  "The Supreme Court has held that courts must evaluate the following factors as part of this 'reasonableness' analysis: [i] the burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies."  *Chloe*, 616 F.3d at 164 (citing *Asahi Metal Industry Co.* v. *Superior Court*, 480 U.S. 102, 113-14 (1987)).

Neither party addresses these factors or provides argument as to whether the exercise of personal jurisdiction over PTI and Grossman would be "reasonable."  Nonetheless, the Court finds that the balance weighs in favor of Plaintiff.  With respect to the second and third factors, the Court finds that New York — the forum state — has a "manifest interest in providing effective means of redress for its residents," *Burger King*, 471 U.S. at 473 (internal quotation marks omitted), and that maintaining the action here would be convenient and efficient for Elsevier because some of its witnesses and other evidence are presumably located here, *Chloe*, 616 F.3d at 172.  The fourth and fifth factors appear to be neutral.  *Id.* at 173.  With respect to the first

23

factor — the burden imposed on Defendants in having to litigate this action in New York — the Court finds this factor incapable of tilting the scales given modern advances in communication and transportation.  *See Bank Brussels II*, 305 F.3d at 129-30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." (internal quotation marks omitted)). Accordingly, considering all of the above, the Court finds that the exercise of jurisdiction over PTI and Grossman is wholly reasonable.

Finally, although the Court has found it can exercise jurisdiction over Defendants, it is worth reiterating that Plaintiff is only required to make a prima facie showing of personal jurisdiction at this stage.  *In re Terrorist Attacks*, 714 F.3d at 673.  "[I]f the ultimate facts do not bear out jurisdiction by a preponderance of the evidence, the case will later be dismissed for lack of personal jurisdiction[.]"  *United States* v. *Machat*, No. 08 Civ. 7936 (JGK), 2009 WL 3029303, at *8 (S.D.N.Y. Sept. 21, 2009); *see also Anderson* v. *Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 498 (S.D.N.Y. 2000) ("[A] plaintiff ultimately bears the burden of establishing jurisdiction over a defendant by a preponderance of the evidence[.]").

### 2.    Defendants' Motion to Dismiss the Civil RICO Claims Is Denied

Defendants challenge Plaintiff's civil RICO claims on three grounds.

Specifically, Defendants argue that Plaintiff has failed to allege: (i) the

timeliness of its claims; (ii) that the subscription scheme constituted a pattern

of racketeering activity; and (iii) that the subscription purchases were related

and continuous acts.  (Def. Br. 8-11).  Plaintiff contends that, in amending its

Complaint, it cured the various deficiencies identified by the Court in its prior

decision and has accordingly sufficiently alleged its civil RICO claims.  (*See* Pl.

Opp. 13, 16).  The Court agrees with Plaintiff, and finds that the Amended

Complaint pleads the minimum needed to survive the instant motion to

dismiss.

### a.    Plaintiff Has Alleged the Timeliness of Its Civil RICO Claims

The limitations period for a civil RICO action is four years.  *Agency*

*Holding Corp.* v. *Mailley-Duff & Assocs., Inc.*, 483 U.S. 143, 156-57 (1987).

"Where, as here, a RICO claim is based on allegations of fraud, the limitations

period begins when plaintiff is placed on notice of facts which should arouse

suspicion."  *Madison 92nd St. Associates, LLC* v. *Courtyard Mgmt. Corp.*, No. 13

Civ. 3921 (CM), 2014 WL 3739322, at *11 (S.D.N.Y. July 29, 2014) (internal

quotation marks omitted).  "Moreover, on a motion to dismiss, unless

Defendants can produce uncontroverted evidence that irrefutably demonstrates

when [P]laintiff discovered or should have discovered the fraudulent scheme,

they cannot satisfy the heavy burden of establishing inquiry notice as a matter

25

of law." *Lapin* v. *Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) (internal quotation marks omitted); *see also LC Capital Partners, LP* v. *Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) ("We recognize that whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." (internal citation omitted)).  Reviewing the Amended Complaint, the Court finds that Plaintiff's allegations regarding the discovery of the subscription fraud sufficiently establish the timeliness of its RICO claims.

Plaintiff alleges that its consultant first investigated Defendants' purchases in November 2009, after another publisher raised concerns about Defendants' purchases of its subscriptions.  (Am. Compl. ¶ 37).  By November 2010, Plaintiff alleges that the consultant had identified the pattern of overlapping purchases by Defendants that constitutes the alleged scheme. (*See id.* at ¶ 38).  Accordingly, Plaintiff has pleaded that it had *actual* notice of the scheme at some point between November 2009 and November 2010 — a period that is within the four-year window.  Defendants counter that Plaintiff *should have* discovered the scheme much earlier because: (i) some of the subscriptions were sent directly to customers in Brazil; and (ii) some of the customer addresses indicated an obvious institutional end-user.  As Plaintiff points out (*see* Pl. Opp. 14-15), Defendants' first argument is somewhat nonsensical.  Plaintiff has alleged that the ultimate end-users of these subscriptions were institutions whose identities were concealed from Elsevier.

26

That Defendants supplied real addresses and that Plaintiff delivered subscriptions to real addresses is not in dispute.  These addresses are alleged to have been mere "way stations" on the journal's fraudulent journey from publisher to institution (*see* Pl. Opp. 15 (citing Am. Compl. ¶¶ 48-57)), and Defendants offer no argument as to why Plaintiff should have known that orders sent to customers in Brazil were suspect.

Defendant's second argument, that Plaintiff was on notice of the alleged fraud because some of the mailing addresses appeared on their face to be addresses of institutional customers (*see* Def. Br. 9), has more traction.  Specifically, Defendants argue that individual subscriptions that were mailed to "Inst Pesquisa Econ Aplicada, Biblioteca-M Emilia Velga" (Am. Compl., Ex. A), should have alerted Plaintiff to the alleged fraud as early as in 2004, when the first subscription was ordered.  (Def. Br. 9).  Put simply, if Plaintiff sold an "individual rate" subscription to a customer that self-identified as an "institutional" client for several years, Defendants argue that Plaintiff was on inquiry notice and had a duty to investigate the subscriptions earlier.  (*See id.*).

Plaintiff responds that these six subscriptions cannot establish that Plaintiff was on inquiry notice of the alleged fraud because: (i) an individual's subscriptions may sometimes be sent to an institutional addresses such as the one at issue;[10] and (ii) it is unreasonable to think that Plaintiff — which

---

[10]    Somewhat curiously, the parties focus on the name and mailing address of this particular customer (Am. Compl., Ex. A at Column I), and not on the "Customer HQ Description" provided (*id.*, Ex. A at Column H).  (*See* Def. Br. 9; Pl. Opp. 15; Def. Reply 8).  Although the precise definition of this column is unclear, *see supra* n.4, to the

publishes more than 2,000 journals and may mail thousands of subscriptions per journal every year — could have detected a *pattern of fraud*, rather than the existence of mere errors, based on the mailing addresses of these six subscriptions.  (Pl. Opp. 15).  At minimum, Plaintiff argues, the question of when Elsevier should have discovered the fraudulent scheme is a question of fact that should not be decided on a motion to dismiss.  (*Id.*).  Under these circumstances, the Court agrees with Plaintiff.

Significantly, it is Defendants' burden to establish inquiry notice on a motion to dismiss, and the Court finds they have failed to do so here.  *See Holmes* v. *Parade Place, LLC*, No. 12 Civ. 6299 (GBD) (DF), 2013 WL 5405541, at *11 (S.D.N.Y. Sept. 26, 2013) ("It is … the defendant's burden to establish inquiry notice, and this burden is a 'heavy' one."); *In re Sumitomo Copper Litig.,* 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) ("In fact, Southern District courts have variously described defendants' burden in this regard as 'extraordinary' and appropriate only in 'extreme circumstances.' (internal citation omitted)).  At most, Defendants have identified a group of six subscriptions that call for a closer scrutiny of Plaintiff's diligence in discovering the alleged fraud.  But the critical issue of when Plaintiff should have been aware of the existence of fraud cannot "be gleaned from the complaint," *LC Capital Partners*, 318 F.3d at 156 (citation omitted), and therefore must be decided on a more complete record,

---

extent this column contains information that reliably classifies institutional and non-institutional customers, it has the potential to be quite significant to the parties' arguments regarding Plaintiff's diligence in discovering the alleged fraud.

*see Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust* v. *J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713 (ERK) (WDW), 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) ("These considerations underscore the wisdom of the observation that whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6), and that the more appropriate vehicle is a motion for summary judgment on a complete record." (internal quotation marks and citations omitted)).

### b.   Plaintiff Has Alleged a Pattern of Racketeering

Defendants also argue that Plaintiff has failed to plead with particularity its allegations of mail and wire fraud. (Def. Br. 10-11). Plaintiffs respond that this argument is at odds with the Court's previous ruling, which noted that one timely allegation of mail and wire fraud had been pleaded with particularity, and which suggested that amendment by Plaintiff to include additional timely allegations — pleaded with the same particularity — could constitute a pattern of racketeering. (Pl. Opp. 16).

To be clear, the Court's previous ruling provided Plaintiff with nothing short of a roadmap to survive the instant motion to dismiss. *See supra*, n.2. Having pleaded one timely allegation of mail and wire fraud with particularity relating to Grossman's purchase of a subscription, Plaintiff amended its Complaint to include details regarding additional purchases — those involving IBIS, PTI, and the Subscribing Defendants. For the reasons stated in the

Court's previous ruling, these allegations are pleaded with sufficient particularity. *See Elsevier*, 2013 WL 6331839, at *10 ("The Court assumes, resolving ambiguities in favor of Plaintiff, that each subscription contained a false statement, namely, that the subscriber did not intend to resell the subscription to an institution."). Because the Amended Complaint now includes 50 such subscriptions, all of which are timely, the Court finds that Plaintiff has alleged a pattern of racketeering activity. *See W.H.P.R.*, 692 F. Supp. 2d at 304 ("[T]hese paragraphs tie each remaining individual defendant to subscriptions for specified journals during a specified subscription year; this sufficiently informs each individual defendant about what it is that he or she is supposed to have done to further the alleged fraud.").

### c. Plaintiff Has Alleged Related and Continuous Acts

Additionally, Defendants argue that Plaintiff's RICO claims should be dismissed for failure to allege related and continuous acts. (Def. Br. 11). Defendants point out that the number of subscriptions alleged to be part of the fraudulent scheme tapers off beginning in 2008. (*Id.*). As such, Defendants argue that Plaintiff cannot demonstrate "an ongoing threat of significant criminal activity." (*Id.*). But Defendants' argument fails because they ignore entirely the alternative showing of "closed-ended" continuity — a showing that Plaintiff has met here. (*See* Pl. Opp. 17).

As the Court noted in its prior decision, the "so-called 'continuity' requirement can be satisfied … by showing a 'closed-ended' pattern — a series

of related predicate acts extending over a substantial period of time[.]"  *Spool* v.

*World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  "Although

closed-ended continuity is primarily a temporal concept, other factors such as

the number and variety of predicate acts, the number of both participants and

victims, and the presence of separate schemes are also relevant in determining

whether closed-ended continuity exists."  *Cofacrédit, S.A.* v. *Windsor Plumbing*

*Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

Defendants provide no argument why "closed-ended" continuity does not

exist on these facts.  Tellingly, even the case cited by Defendants in reply to

Plaintiff's argument that closed-ended continuity has been established notes,

"*there is no continuity problem in this case.*  The Complaint alleges that the

fraudulent activity extended over roughly a decade.  It thus alleges a closed

period of repeated conduct lasting well more than two years."  *W.H.P.R.*, 692 F.

Supp. 2d at 309 (emphasis added); *see also City of New York* v. *LaserShip, Inc.*,

No. 13 Civ. 7535 (GBD), 2014 WL 3610927, at *4 (S.D.N.Y. July 10, 2014)

("[T]wo years is a sufficient duration to find closed-ended continuity.");

*Hemmerdinger Corp.* v. *Ruocco*, 976 F. Supp. 2d 401, 416 (E.D.N.Y. 2013)

("Having alleged predicate acts which … continued for a period of over two

years, Plaintiff has adequately pled closed-ended continuity.").  The Court

reaches the same conclusion.  Defendants purchased subscriptions from

roughly 2004 to 2011 in furtherance of the alleged subscription scheme.  This

seven-year span more than satisfies what is — first and foremost — a temporal

requirement.  *See United States* v. *Cain,* 671 F.3d 271, 288 (2d Cir. 2012) ("The

extortions occurred over more than two years, which we have held is a

sufficient period to support a finding of closed-ended continuity."); *Fresh*

*Meadow Food Servs., LLC* v. *RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008)

(summary order) ("Where the racketeering acts span nearly three and one-half

years, as they do here, the presence or absence of the other factors is less

critical.").

     In sum, the Court finds that Plaintiff has taken account of the

deficiencies identified by the Court in its prior ruling, has addressed these

deficiencies by providing specific details about the subscriptions, and has thus

adequately pleaded its civil RICO claims.

### 3.    Defendants' Motion to Dismiss the State-Law Claims Is Granted in Part and Denied in Part

     While Plaintiff's Amended Complaint includes additional factual

allegations to bolster its civil RICO claims, it contains virtually no new

information to support its state-law claims.  Accordingly, much of the analysis

in the Court's December 5, 2013 Opinion and Order controls.  As set forth

herein, Defendants' motion with respect to Plaintiff's fraud claim is granted,

and Defendants' motion with respect to Plaintiff's conversion claim is denied.

*See Elsevier*, 2013 WL6331839, at *13.

### a.    Plaintiff Has Failed to Allege a Fraud Claim

     If, as noted above, Plaintiff followed the Court's roadmap with respect to

its civil RICO claims, the opposite is true with respect to Plaintiff's state-law

fraud claim.  "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement."  *Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007).  The Court previously found that Plaintiff had "alleged the misrepresentation of a future fact, i.e., future performance of the contract, and thus could not sustain claims for both fraud and breach of contract."  *See Elsevier*, 2013 WL 6331839, at *13.  Nothing in Plaintiff's Amended Complaint changes the Court's conclusion.  Accordingly, Plaintiff's state-law fraud claim is dismissed.[11]

### b.    Plaintiff Has Alleged a Conversion Claim

The Court previously determined that Plaintiff had adequately alleged its state-law conversion claim.  *See Elsevier*, 2013 WL 6331839, at *13 ("Plaintiff alleges that Defendants took possession of Elsevier's revenues, in the form of

---

[11]    Plaintiff cites two cases to support its ability to maintain a state-law fraud claim.  (Pl. Opp. 18).  These cases are easily distinguishable because they each involved misrepresentations collateral to the contract.  *See Merrill Lynch*, 500 F.3d at 180-81, 184 (allowing fraud claim to proceed where party made misrepresentations regarding the target company's finances); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 302 (E.D.N.Y. 2002) (denying motion to dismiss fraud claims where "defendant induced plaintiff to enter the contract with fraudulent misstatements of fact").  The only misrepresentations that Plaintiff alleges in this case were the representations and warranties recited in the contract.  (*See* Am. Compl. ¶ 22).  *See, e.g., Four Finger Art Factory, Inc.* v. *Dinicola*, No. 99 Civ. 1259 (JGK), 2000 WL 145466, at *5 (S.D.N.Y. Feb. 9, 2000) ("Here, it is clear that the plaintiff's claim for fraudulent inducement relies on allegations which are not collateral to the contract .... There is nothing about the plaintiff's allegation with respect to [the] warranty which raises any alleged misrepresentation going beyond what is contained in this provision of the contract.").  If Defendants made other misrepresentations to induce Plaintiff into contracting with them, as the parties in *Merrill Lynch* and *CINAR* did, Plaintiff has failed to plead these in its Amended Complaint.

the higher institutional subscription rates, *and its customer data*." (emphasis added)).  Plaintiff's Amended Complaint continues to allege the same conversion claim.  Nevertheless, Defendants "urge the Court to reconsider its reasoning, since forfeiting such revenues constitutes a strictly monetary loss, which does not support a claim for conversion."  (Def. Br. 12-13 (citing *Columbia Marine Servs., Inc.* v. *Reffet Ltd.*, 861 F.2d 18, 23 (2d Cir. 1988)).  To begin with, even the case cited by Defendants indicates that "in some instances money, like any other chattel, may be converted[.]"  *Columbia Marine*, 861 F.2d at 23.  It may very well be that conversion is not the most natural or obvious claim under these circumstances, but Defendants have not explained — or attempted to explain — why the specific revenues allegedly lost in this case are not amenable to conversion.  Even assuming *arguendo* that a claim of conversion based on loss of revenue is inappropriate on these facts, Defendants have provided no argument as to why Plaintiff's claim of conversion based on the loss of end-user customer data cannot suffice to support Plaintiff's claim for conversion.  Accordingly, the Court declines to reconsider its prior ruling on this issue, and Defendants' motion to dismiss the conversion claim is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of personal jurisdiction is DENIED; Defendants' motion to dismiss Plaintiff's civil RICO claims is DENIED; Defendants' motion to dismiss Plaintiff's conversion

claim is DENIED; and Defendants' motion to dismiss Plaintiff's state-law fraud claim is GRANTED.

It is hereby ORDERED that the parties appear for a pretrial conference on **January 23, 2015, at 11:00 a.m.**, to be held in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, to set a schedule for discovery. The parties should submit a proposed Case Management Plan to the Court in PDF format by **January 15, 2015**.

The Clerk of Court is directed to terminate Docket Entry 39.

SO ORDERED.

Dated:       January 5, 2015
             New York, New York

                                            _____
                                            KATHERINE POLK FAILLA
                                            United States District Judge