UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

ELSEVIER, INC., *et al.*,

                        Plaintiff,

            v.

PIERRE GROSSMAN, *et al.*,

                    Defendants.

------------------------------------------------------X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>August 4, 2016</u> |

12 Civ. 5121 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Elsevier Inc., Elsevier B.V., Elsevier Ltd., and Elsevier Masson SAS (collectively, "Plaintiffs" or "Elsevier") publish scientific, technical, and medical journals. On June 29, 2012, Plaintiffs initiated this action against Defendants Publicações Técnicas Internacionais ("PTI"), IBIS Corp. ("IBIS"), and Pierre Grossman ("Grossman" and, together with PTI and IBIS, "Defendants"), alleging that Defendants had obtained multiple journal subscriptions at discounted rates, and then resold the journals to institutions that were ineligible for the discounts. On May 8, 2015, the Court entered default judgment against PTI and IBIS, but Grossman proceeded to trial. On January 14, 2016, a jury determined that Grossman had violated the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act"), 18 U.S.C. §§ 1961-68, but that he had not engaged in a conspiracy to violate the Act. The jury further determined that Grossman had breached one or more contracts with Plaintiffs and that he had converted Plaintiffs' property. The

jury awarded Plaintiffs $11,108 in damages for the RICO violation and $6,201 for the contractual breaches, but found that Plaintiffs had not been damaged by the conversion of their property.

On February 15, 2016, Grossman filed a motion for judgment as a matter of law on the RICO claim (the "RICO Motion").  The following day, Plaintiffs filed: (i) a motion for judgment as a matter of law on the question of RICO damages, or in the alternative, for a new trial solely on the question of RICO damages (the "Damages Motion"); (ii) a motion for an award of damages and an entry of final default judgment against PTI and IBIS (the "Motion for Final Default Judgment"); and (iii) a motion for attorneys' fees and costs under 18 U.S.C. § 1964(c) (the "Fee Motion").  For the reasons set forth herein, the RICO Motion is granted, but Plaintiffs may request a new trial at which they might be able to establish RICO liability against Grossman; the Damages Motion is denied; the Motion for Final Default Judgment is granted in part and denied in part; and the Fee Motion is denied.

**BACKGROUND**[1]

The Court assumes familiarity with the facts and procedural history set
forth in its prior decision denying Plaintiffs' motion for default judgment and
granting Plaintiffs leave to amend the Complaint, *Elsevier, Inc.* v. *Grossman*,
No. 12 Civ. 5121 (KPF), 2013 WL 6331839 (S.D.N.Y. Dec. 5, 2013) ("*Elsevier I*"),
as well as the Court's opinion granting in part Defendants' motion to dismiss,
*Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015) ("*Elsevier II*").
For convenience, the facts relevant to this Opinion are set forth below.

**A.   Factual Background**

**1.   Plaintiffs' Business**

Plaintiffs are a group of related publishing companies with offices in
Amsterdam, Paris, London, and New York.  (*See* Tr. 149).  Together, Plaintiffs
produce approximately 2,000 scientific and technological journals, which are
geared toward "specialists and professionals" in various fields of medicine,
science, and engineering.  (*See id.* at 149-50).  Plaintiffs incur substantial costs
to create these journals, including the costs of soliciting articles; reviewing the

---

[1]   The facts in this Opinion are drawn from the trial transcript ("Tr.") and the trial exhibits ("Ex."), unless otherwise indicated.

For convenience, the Court will refer to Grossman's brief in support of the RICO Motion as "Def. RICO Br." (Dkt. #194), Plaintiffs' brief in opposition to the RICO Motion as "Pl. RICO Opp." (Dkt. #204), and Grossman's reply as "Def. RICO Reply" (Dkt. #208).  In addition, the Court will refer to Plaintiffs' brief in support of the Damages Motion as "Pl. Damages Br." (Dkt. #186) and Plaintiffs' brief in support of the Motion for Final Default Judgment as "Pl. Default Br." (Dkt. #188).  (Defendants did not submit any opposition to these motions.)  Similarly, the Court will refer to Plaintiffs' brief in support of the Fee Motion as "Pl. Fee Br." (Dkt #190); Grossman's opposition to the Fee Motion as "Def. Fee Opp." (Dkt #205); and Plaintiffs' reply as "Pl. Fee Reply" (Dkt. #206).  Finally, the Court will refer to Plaintiffs' response to the Court's request for supplemental briefing as "Pl. Supp. Br." (Dkt. #219) and Defendant's response to the Court's request as "Def. Supp. Br." (Dkt. #220).

articles; and printing and distributing the journals to customers.  (*Id.* at 150-51).

Plaintiffs sell their journals through annual subscriptions, either directly or through subscription agents.  (Tr. 151, 154).  Subscription agents help customers complete the paperwork required to obtain subscriptions for various journals.  (*See id.* at 154).

Plaintiffs charge two different prices for their products: Institutions (such as universities and libraries) pay full price, because Plaintiffs expect that institutions will make their journals available to multiple readers.  (Tr. 151-52).  By contrast, if an individual wishes to purchase a journal for his or her own personal use, he or she can order the journal at a discounted rate.  (*Id.*).  Plaintiffs do not earn a profit on the subscriptions sold to individuals at the discounted price.  (*Id.* at 152-53).  As a result, when a subscription agent buys a journal for an individual reader, or when an individual buys a journal directly from Plaintiffs, the agent or the individual must sign a contract stating that the journal has been ordered for "valid personal use."  (*See, e.g.*, Ex. 11; *see also* Tr. 154-55).  In other words, the agent or the individual must promise that the journal will not be given to an institution that should have paid full price.  (*Id.* at 154-55).

### 2.   Defendants' Business

Pierre Grossman is a citizen and resident of Brazil.  He is also the president and founder of PTI — a Brazilian subscription agency.  (Tr. 341, 344, 348-49).  Since 2000, Grossman and his wife have been PTI's sole

shareholders.  (*Id.* at 341).  PTI has a handful of employees, including Grossman's brother-in-law, Roberto Saad.  (*Id.* at 343, 345).

As the president of PTI, Grossman ordered thousands of journal subscriptions for Brazilian institutions and individuals from publishers located "all over the world." (*See* Tr. 348).  However, he found that Brazilian regulations made it very difficult for PTI to pay these publishers.  (*Id.* at 346).  As Grossman testified at trial, the Brazilian Central Bank charges a flat fee for any check sent from Brazil to a foreign country.  (*Id.* at 348).  Thus, if PTI sent multiple checks to foreign publishers, it would have to pay a fee for each check. (*Id.*).  In order to reduce PTI's banking fees, Grossman established a New York corporation called IBIS.  (*Id.* at 345, 348-49).  Each month, Grossman would send one large check from PTI's account in Brazil to IBIS's account in New York, and the Brazilian Central Bank would charge him only one fee.  (*See id.* at 348-49).  Once the money arrived in IBIS's account, Grossman would use it to pay various publishers, including Plaintiffs.  (*See id.*).

Grossman also testified that around the year 2000, he and his family purchased a small apartment in Garden City, New York.  (Tr. 342).  This apartment served as an "office" and mailing address for IBIS.  (*Id.* at 341-42).  Occasionally, Grossman asked publishers to ship journals to the apartment because "the Post office didn't work in Brazil for delivery."  (*Id.* at 348, 350).

### 3.    Defendants' Subscription Fraud

Between 2007 and 2011, Defendants ordered 51 journal subscriptions from Plaintiffs at the discounted rate applicable to individual readers.  (Ex. 10).

Nevertheless, over the course of the trial, Plaintiffs proved conclusively that Defendants acquired the 51 subscriptions for Brazilian institutions, which were ineligible for the discount.  (*Id.*).

## B.    Procedural Background

### 1.    The Pretrial Proceedings

Plaintiffs filed the instant action on June 29, 2012.  (Dkt. #1).  However, Grossman, PTI, and IBIS missed their deadline to answer the Complaint. Consequently, on June 7, 2013, the Clerk of Court entered certificates of default against these three defendants.  (Dkt. #8-10).  The Court issued an Order to Show Cause on July 30, 2013, requiring Grossman, IBIS, and PTI to show cause why a default judgment should not be entered against them. (Dkt. #12).  On August 30, 2013, the Court held a hearing at which Grossman, PTI, and IBIS were jointly represented by counsel; counsel raised several arguments opposing the entry of default judgment.  (*See generally* Aug. 30 Tr.). On December 5, 2013, the Court issued an Opinion and Order vacating the certificate of default against Grossman, PTI, and IBIS, largely because Plaintiffs had not adequately pleaded their RICO claims.  *See generally Elsevier I*, 2013 WL 6331839.

On February 4, 2014, Plaintiffs filed an Amended Complaint, which cured the deficiencies that the Court had identified in the original Complaint. (Dkt. #33).  On May 20, 2014, Defendants moved to dismiss the Amended Complaint for lack of subject matter jurisdiction and failure to state a claim. (Dkt. #39).  On January 5, 2015, the Court issued an Opinion and Order

denying Defendants' motion in part and granting it in part.  *See generally Elsevier II*, 77 F. Supp. 3d 331.  The Court held that it had personal jurisdiction over Defendants, and that Plaintiffs had stated valid RICO claims.  *Id.* at 342-51.  The Court further held that Plaintiffs had stated a valid claim for conversion under New York law.  *Id.* at 352.  However, the Court concluded that Plaintiffs had *not* stated a valid state-law claim for fraud.  *Id.*

On January 23, 2015, Defendants' counsel moved to withdraw. (Dkt. #47).  After the Court granted counsel's motion (Dkt. #49), Grossman decided to proceed *pro se* (*see* Dkt. #52).  Similarly, PTI and IBIS declined to retain new counsel.  (Dkt. #55).  As corporate entities, however, PTI and IBIS could not take any action in this case without an attorney.  *See Sec. & Exch. Comm'n* v. *Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975) ("It is settled law that a corporation may not appear in a lawsuit against it except through an attorney[.]" (internal citation omitted)).  Thus, PTI and IBIS defaulted.  (Dkt. #65-66).

On April 7, 2015, this Court issued a second Order to Show Cause why default judgment should not be entered against the two corporate Defendants. (Dkt. #70).  Following a hearing on May 8, 2015, the Court "ordered, adjudged[,] and decreed that Plaintiffs ha[d] judgment against [D]efendants IBIS and PTI as to liability on those claims in Plaintiffs' Amended Complaint remaining after the Court's January 5, 2015 Opinion and Order."  (Dkt. #80 (capitalization omitted)).  But the Court deferred an inquest on damages until

after it had reached "a disposition of the claims against [D]efendant Pierre Grossman." (*Id.*).

### 2.     The Trial

Trial against Defendant Grossman began on January 11, 2016, and lasted four days. (*See* Dkt. #196-203). Over the course of these proceedings, Plaintiffs presented testimony from multiple witnesses. (Tr. 148-394). Rayan Guman, an employee of Elsevier BV, testified about Elsevier's business model and the steps that Elsevier takes to discover and combat subscription fraud. (Tr. 148-254).

In addition, Andrew Pitts, an employee of Publisher Solutions International ("PSI"), testified that Plaintiffs submit data about their customers to PSI, and PSI analyzes this data to identify individuals who may be ordering subscriptions at an individual rate, and then reselling those subscriptions to institutions. (Tr. 285-313). Pitts also explained how he discovered Defendants fraudulent conduct. (*Id.*). Pitts testified that, with the help of an algorithm, he was able to identify several suspicious subscriptions ordered by Defendants. (*Id.*). For example, he identified a large number of subscriptions — for journals that spanned a variety of disciplines — that were ordered on behalf of one individual. (*See id.* at 304-05, Ex. 51). Because it is very unlikely that an individual reader would order such a broad array of journals for his own personal use, these subscriptions raised a "red flag." (Tr. 305). Similarly, Pitts testified that he was surprised to see multiple PTI subscriptions — purportedly ordered on behalf of a variety of individuals with different names — shipped to

a single address.  (*Id.*).  In Pitts's words: "[I]f you are receiving to one address subscriptions for a whole multitude of names, you've either got a very, very full house, or you're receiving things for other people.  Again, … it's a red flag." (*Id.*).

Plaintiffs also called Grossman as a witness to explain his subscription business and the orders that he had placed on behalf of PTI's customers. (Tr. 340-88).  Finally, Plaintiffs introduced a wide variety of business records, including order forms, invoices, and receipts — from themselves and PTI — suggesting that Defendants were purchasing subscriptions on behalf of individuals, and then reselling them to institutions.  (*See* Pl. Damages Br. 5-8 (listing the documents used to demonstrate subscription fraud)).

After Plaintiffs presented their case, the Court "deem[ed] [Grossman] to have made a motion for judgment in [his] favor as a matter of law on any grounds that were available to [him] … at [that] time."  (Tr. 395).  Then, Plaintiffs' counsel proceeded to explain why he believed that Plaintiffs had presented adequate evidence to support their substantive RICO claim, RICO conspiracy claim, breach-of-contract claim, and conversion claim.  (*Id.* at 395-401).  Ultimately, the Court "reserve[d] on the motion" for judgment as a matter of law.  (*Id.* at 401).

Grossman testified on his own behalf, and claimed that Defendants were falsely accusing him of subscription fraud to run him out of business. (Tr. 388-94).  He did not present any other evidence to the jury.

After five hours of deliberations, the jury determined that Grossman had violated RICO, but had not conspired to violate the Act.  (Dkt. #167).  The jury also determined that Grossman had breached one or more contracts with Plaintiffs and converted Plaintiffs' property.  (*Id.*).  The jury awarded $11,108 in damages for the RICO violation and $6,201 for the contractual breaches, but did not award any damages on the conversion claims.  (*Id.*).

### 3.    The Motion for a Preliminary Injunction and Writ of Attachment

On December 28, 2015, less than a month before trial was set to begin, Plaintiffs moved for a temporary restraining order or, in the alternative, for a writ of pre-judgment attachment.  (Dkt. #155).  Plaintiffs sought this relief to restrain newly-discovered funds in an account belonging to IBIS, which funds could be used to satisfy any judgment against Defendants in this case.  (Dkt. #156).  As is relevant here, Plaintiffs explained that they were entitled to restrain the funds because, under some circumstances, New York law allows a plaintiff to restrain the funds of a foreign defendant, and the funds in the IBIS account belonged to PTI — a foreign corporation.  (*Id.* at 6-7).  More specifically, Plaintiffs argued:

> [E]ven though the ... account is held in the name of IBIS, as Mr. Grossman testified at his deposition and has repeated in correspondence, the funds in that account belong to PTI. ... The very purpose of IBIS's existence is for PTI to be able to process international payments to ... publishers, while minimizing transactional fees that would otherwise be required every time PTI wanted to transfer money from Brazil .... Thus, in a real sense, the funds currently in the IBIS account are PTI's funds, which are deposited into IBIS's

10

> account solely for the purpose of paying for
> subscriptions placed by PTI and furthering PTI's
> business.

(*Id.* at 7). On December 30, 2015, the Court held a telephone conference to discuss Plaintiffs' application, and then requested additional written submissions from the parties. (*See* Dkt. #165). Plaintiffs submitted additional materials to the Court on January 4, 2016. (Dkt. #161). The Court held further oral arguments on Plaintiffs' application on January 11, 2016. (Dkt. #196). During these arguments, the Court asked the parties to confirm that IBIS is merely an alter ego of PTI. (*Id.* at 23-24). In response to questions from the Court, Grossman confirmed that: (i) IBIS has no employees; and (ii) IBIS has "no operations" and exists "only as a pass[-]through" for money sent from PTI to non-Brazilian publishers. (*Id.* at 26).

On January 15, 2016, the Court denied Plaintiffs' request for a temporary restraining order or writ of attachment without prejudice, and stated that Plaintiffs could "renew their application for either form of relief if they present[ed] additional information suggesting that an order of attachment [was] necessary to protect their rights." (Dkt. #168). On January 27, 2016, after the trial against Grossman had concluded, Plaintiffs filed a renewed application for a preliminary injunction or writ of attachment restraining the funds in the IBIS account; this application contained a more robust explanation of Plaintiffs' concerns that the funds might disappear in the absence of court intervention. (Dkt. #174). In their renewed application, Plaintiffs reiterated their belief that IBIS's "sole function" is to serve as "a pass-through for payments from PTI to

11

publishers." (Dkt. #175 at 2).  On January 29, 2016, the Court granted

Plaintiffs' request for a preliminary injunction, and restrained $300,000 in the

IBIS account.  (Dkt. #180).[2]

### 4.     The Post-Trial Motions

The parties filed their post-trial motions on February 15 and 16, 2016

(Dkt. #185, 187, 189, 192), and they filed their opposition papers on March 15,

2016 (Dkt. #204-05).  Finally, they filed their reply on March 29, 2016.

(Dkt. #206, 208).[3]

On June 24, 2016, the Court issued an order requesting supplemental

briefing from the parties regarding: (i) the Supreme Court's June 20, 2016

decision in *RJR Nabisco, Inc.* v. *European Cmty.*, __ U.S. __, 136 S. Ct. 2090

(2016); and (ii) potential inconsistency in the jury's verdicts.  (Dkt. #211).  Both

parties submitted their supplemental briefs on July 15, 2016.  (Dkt. #219-20).

### DISCUSSION

## A.     Applicable Law

### 1.     Motions Under Federal Rule of Civil Procedure 50

Under Federal Rule of Civil Procedure 50, a litigant may move for

judgment "as a matter of law" after a trial.  Rule 50 "imposes a heavy burden

on [the] movant, who will be awarded judgment as a matter of law only when a

---

[2]     The funds in the IBIS account are now the subject of an interpleader proceeding in this Court, *JPMorgan Chase Bank, N.A.* v. *John Wiley & Sons, Inc.*, *et al.*, No. 16 Civ. 4201 (KPF).

[3]     Because there may have been some delay in processing Grossman's papers through the District's *Pro Se* Office, the Court will presume that his papers were filed on the dates provided in the documents themselves, rather than the dates appearing on the docket sheet.

party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Cash* v. *County of Erie,* 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted); *accord Bucalo* v. *Shelter Island Union Free Sch. Dist.,* 691 F.3d 119, 127-28 (2d Cir. 2012). The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash,* 654 F.3d at 333 (internal quotation marks omitted). In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted); *accord Stampf* v. *Long Island R.R. Co.,* 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g., Zellner* v. *Summerlin,* 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party" (internal quotation marks omitted)).

### 2.    RICO

Congress enacted RICO to combat "racketeering activity." See *RJR Nabisco*, 136 S. Ct. at 2096-97. "Racketeering activity" occurs when an individual commits two or more predicate offenses within a ten-year period, *see*

18 U.S.C. § 1961(5); those predicate offenses are related to one another, *see*

*H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); and the predicates

"amount to or pose a threat of continued criminal activity," *id.*

The heart of RICO is 18 U.S.C. § 1962, which creates four substantive

prohibitions against "racketeering activity." This case concerns the third and

fourth prohibitions. The third prohibition reads:

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection
> of unlawful debt.

18 U.S.C. § 1962(c). The fourth prohibition makes it unlawful for anyone to

conspire to violate any part of § 1962. 18 U.S.C. § 1962(d).

While RICO establishes criminal penalties for violations of § 1962, *see* 18

U.S.C. § 1963, it also creates a private right of action for individuals who are

harmed by racketeering activity, *see* 18 U.S.C. § 1964. Section 1964 provides,

in relevant part, that "[a]ny person injured in his business or property by

reason of a violation of section 1962 of this chapter may sue therefor in any

appropriate United States district court and shall recover threefold the

damages he sustains and the cost of the suit, including a reasonable attorney's

fee[.]" 18 U.S.C. § 1964(c).

**B.     Analysis**

**1.     The Court Grants Grossman's RICO Motion**

Grossman argues that he is entitled to judgment as a matter of law for two reasons: (i) Plaintiffs failed to prove the existence of a RICO enterprise that was distinct from Grossman; and (ii) holding Grossman liable under federal law would involve an impermissible extraterritorial application of the RICO statutes.  The Court will address each of these arguments in turn.

**a.     Plaintiffs Proved the Existence of a RICO Enterprise That Was Distinct from Grossman**

RICO provides that it is unlawful for a "person" who is "employed by or associated with" an "enterprise" to conduct the enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(c).  Thus, to recover damages under 18 U.S.C. § 1964, a plaintiff must "prove the existence of two distinct entities: [i] a 'person'; and [ii] an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161 (2001); *accord First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).  According to Grossman, a plaintiff cannot satisfy this distinctiveness requirement by alleging that corporate employees are "persons" who operate a corporate "enterprise."  (*See* Def. RICO Br. 3-5; Def. RICO Reply 3-5).  After all, when corporate employees take action within the scope of their employment, those actions are not generally regarded as the actions of discrete individuals; rather, they are regarded as the actions of a single corporate person.  (*See* Def. RICO Br. 3-5

(citing *Riverwoods Chappaqua Corp.* v. *Marine Midland Bank, N.A.*, 30 F.3d
339, 344 (2d Cir. 1994)); Def. RICO Reply 3-5).  This single corporate person
can only be held liable for participating in a criminal "enterprise" if it associates
with *another* individual or organization.  (*See id.*).

Applying these principles, Grossman contends that Plaintiffs have failed
to satisfy RICO's distinctiveness requirement.  (*See* Def. RICO Br. 3-5; Def.
RICO Reply 3-5).  Over the course of the trial, Plaintiffs argued that Grossman
participated in a RICO enterprise consisting of PTI, IBIS, Roberto Saad, and
Grossman himself.  (*See* Tr. 424-25, 464).  However, Plaintiffs also maintained
that PTI and IBIS were alter egos.  (Dkt. #208 Def. RICO Reply 1-5).  Thus,
Grossman argues, the alleged enterprise in this case consists of a single
corporation — known to some entities as PTI and other entities as IBIS — as
well as two of the corporation's employees, with no proof that PTI and IBIS were
associated with some other individual or organization.  (*See* Def. RICO Br. 3-5;
Def. RICO Reply 3-5).  In other words, Plaintiffs never proved that Defendants
participated in a RICO enterprise distinct from themselves.  (*See id.*).

This line of reasoning is squarely foreclosed by the Supreme Court's
decision in *Cedric Kushner*.  In that case, the Supreme Court considered
whether a plaintiff could satisfy RICO's distinctiveness requirement by proving
that an officer of a corporation was "employed by or associated with" the
corporation, and that the officer "conduct[ed] the corporation's affairs in a
RICO-forbidden way."  533 U.S. at 161-63.  Ultimately, the Court concluded
that the answer to this question is yes.  *See id.* at 163.  As the Court explained,

16

a corporate officer is a "natural person[] … distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id.* And nothing in RICO requires more distinctiveness than that. *Id.* Here, Plaintiffs have proved that Grossman, a natural person, conducted the affairs of PTI and IBIS in a RICO-forbidden way. Under *Cedric Kushner*, this proof is sufficient to support the jury's conclusion that Grossman violated RICO.

Grossman contends that *Cedric Kushner* is inapposite because, in that case, the "person" who allegedly violated RICO was the sole officer (and sole employee) of a closely held corporation, and the RICO enterprise was the corporation itself. (Def. RICO Reply 3 (citing *Cedric Kushner*, 533 U.S. at 164)). However, the Supreme Court was careful to distinguish cases like *Riverwoods*, where the "person" charged with violating RICO was a corporation, and the alleged enterprise consists of the "corporation, together with all its employees and agents." *Cedric Kushner*, 533 U.S. at 164 (citing *Riverwoods*, 30 F.3d at 344). As the Supreme Court explained, "[i]t is natural to speak of a corporate employee as a 'person employed by' the corporation." *Id.* (quoting § 1962(c)). But it is "less natural" to speak of a corporation as a person "employed by" or "associated with" itself and its agents. *Id.* Thus, the Court refused to overturn *Riverwoods*' holding that a corporate "person" cannot be held liable for violating RICO if the alleged "enterprise" consists solely of the corporation and its employees. *Id.* (citing *Riverwoods*, 30 F.3d at 344). In this case, Grossman insists, there is only one "person" responsible for committing RICO

17

predicates — the corporate person known as PTI or IBIS.  (Def. RICO Reply 3).
And under *Riverwoods*, this "person" is insufficiently distinct from the alleged
RICO "enterprise," which consists of the corporate person and two of its
employees (Grossman and Saad).  (*Id.* (citing *Riverwoods*, 30 F.3d at 344)).

This argument misses the mark.  *Cedric Kushner* asks courts to consider
the nature of the "person" who is accused of violating RICO.  If a "natural
person" is accused of violating the statute, that "person" is distinct from any
corporate "enterprise" because: (i) as a natural person, his legal rights and
responsibilities are different from those of the corporation; and (ii) from a
grammatical perspective, it makes sense to say that a natural person
associates with or is employed by a corporation.  For precisely the same
reasons, a natural person is distinct from an enterprise consisting of a
corporation and its employees.  By contrast, a corporate person may not be
distinct from an enterprise consisting of the corporation and its employees
because: (i) the corporation may have the same legal rights and responsibilities
as such an enterprise; and (ii) as explained above, it makes little grammatical
sense to say that a corporation associates with itself and its agents.

Here, there is no dispute that Grossman is a natural person.  Thus,
under *Cedric Kushner*, there can be no dispute that Grossman is distinct from
an enterprise consisting of PTI/IBIS and its employees.  Grossman cannot
escape this conclusion by arguing that PTI/IBIS also happened to be accused
of violating RICO, and PTI/IBIS may be an improper defendant under

*Riverwoods.*  Even if PTI/IBIS were an improper defendant, that would not change the fact that Plaintiffs raised a proper RICO claim against Grossman.

### b.   Holding Grossman Liable Under Federal Law Would Involve an Impermissible Extraterritorial Application of RICO

Alternatively, Grossman contends that holding him liable under federal law would involve an impermissible extraterritorial application of RICO.  (*See* Def. RICO Br. 5-6; Def. RICO Reply 5-6; Def. Supp. Br. 2-4).  While the Court cannot accept all of Grossman's arguments on this front, it agrees with his ultimate conclusion.

### i.   Extraterritoriality in General

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'"  *RJR Nabisco*, 136 S. Ct. at 2100 (quoting *Microsoft Corp.* v. *AT & T Corp.,* 550 U.S. 437, 454 (2007)).  Thus, when courts interpret federal statutes, they must presume that those statutes only apply within U.S. borders; this presumption can only be rebutted by an "affirmative[] and unmistakabl[e]" instruction from Congress that the statute applies extraterritorially.  *Id.* (citing *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)).  This rule of statutory construction ensures that Congress — rather than the judiciary — is the entity navigating the "delicate field of international relations."  *Kiobel* v. *Royal Dutch Petroleum Co.*, __ U.S. __, __, 133 S. Ct. 1659, 1664 (2013).

To determine whether the presumption against extraterritoriality limits the reach of a statutory provision in a particular case, a court must employ a

two-step procedure.  At the first step, the Court asks "whether the presumption against extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."  *RJR Nabisco*, 136 S. Ct. at 2101.  The court "must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction."  *Id.*  If the statute applies extraterritorially, then the Court's inquiry is at its end.  *See id.*

However, if there is nothing in the statute to rebut the presumption against extraterritoriality, the court must proceed to the second step of the analysis, which requires the court to consider whether the case involves a domestic or extraterritorial application of the relevant law.  *RJR Nabisco*, 136 S. Ct. at 2101.  A court "do[es] this by looking to the statute's 'focus'":

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*Id.*; *accord In Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, __ F.3d __, No. 14-2985, 2016 WL 3770056, at *9 (2d Cir. July 14, 2016).

20

### ii.    Extraterritoriality of the RICO Statutes

In *RJR Nabisco*, the Supreme Court applied this two-step framework to determine the extent to which the "substantive prohibitions in § 1962 may apply to foreign conduct."  136 S. Ct. at 2101.  At step one, the Court found that § 1962 "gives a clear, affirmative indication that [it] applies to foreign racketeering activity — but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."  *Id.* at 2102.  Thus, for any crime to constitute a proper predicate act under RICO, the crime must involve: (i) a violation of a statute that applies extraterritorially *or* (ii) domestic conduct that is relevant to the "focus" of a domestic criminal statute.  *See id.* at 2101-02.

After considering the extraterritorial reach of § 1962, the Supreme Court went on to decide whether § 1964 — which creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962" — also applies extraterritorially.  *RJR Nabisco*, 136 S. Ct. at 2106 (quoting 18 U.S.C. § 1964).  The Court explained that "we separately apply the presumption against extraterritoriality to RICO's cause of action despite our conclusion that the presumption has been overcome with respect to RICO's substantive prohibitions."  *Id.*  And "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States."  *Id.* at 2108.  Thus, the Court concluded, "[s]ection 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries."

*Id.* at 2111.  The Court acknowledged that "the application of this rule in any given case will not always be self-evident," but declined to articulate a definition of a "domestic injury to business or property," leaving that question for another case.  *Id.*

With this background in mind, the Court now turns to Grossman's specific contentions regarding extraterritoriality.

### iii.   It Does Not Matter Whether Grossman Participated in a Foreign or a Domestic Enterprise

According to Grossman, Congress did not give any indication that it intended for RICO to apply to foreign criminal enterprises, and as a result, the statute does not apply in cases where the relevant enterprise is located outside the United States.  (Def. RICO Br. 5-6).  Throughout this litigation, Plaintiffs have argued that Grossman participated in a Brazilian enterprise.  (*Id.* at 6).  As noted above, Plaintiffs have argued that the relevant enterprise consists of: Grossman, a Brazilian citizen and resident; Roberto Saad, also a Brazilian citizen and resident; and PTI, a Brazilian corporation with an American alter ego.  (*Id.*).  Grossman characterizes this collection of actors as a foreign — rather than a domestic — enterprise.  (*Id.*).  Thus, Grossman concludes that he cannot be held liable under RICO.  (*Id.*).

This argument is inconsistent with the Supreme Court's analysis in *RJR Nabisco*, where the Court expressly held that "Congress did not limit RICO to domestic enterprises."  *RJR Nabisco*, 136 S. Ct. at 2104.  As the Court explained, it would be extremely difficult to determine whether an enterprise

22

requirement is foreign or domestic because "RICO association-in-fact enterprises … need not have a hierarchical structure or a chain of command," and such loosely constructed entities may not have an easily identifiable "nerve center" in one particular location.  (*Id.* at 2104-05 (internal quotation marks omitted)).  In addition, "[a] domestic enterprise requirement would lead to … counterintuitive results":

> Imagine, for example, that a foreign corporation has operations in the United States and that one of the corporation's managers in the United States conducts its U.S. affairs through a pattern of extortion and mail fraud. Such domestic conduct would seem to fall well within what Congress meant to capture in enacting RICO. Congress, after all, does not usually exempt foreigners acting in the United States from U.S. legal requirements. *See* 764 F.3d, at 138 ("Surely the presumption against extraterritorial application of United States laws does not command giving foreigners carte blanche to violate the laws of the United States in the United States"). Yet [a domestic enterprise requirement] would insulate this scheme from RICO liability[.]

*Id.* at 2104.  These "practical problems" with a domestic enterprise requirement bolstered the Court's "conclusion, based on RICO's text and context, that Congress intended the prohibitions in 18 U.S.C. §§ 1962(b) and (c) to apply extraterritorially in tandem with the underlying predicates, without regard to the locus of the enterprise."  (*Id.* at 2105).  Thus, Grossman cannot escape RICO liability merely because he participated in a Brazilian enterprise.

### iv. Plaintiffs' RICO Case Does Not Turn on Extraterritorial Applications of the Wire Fraud Statute

Construed liberally, Grossman's briefs suggest that this case involves an impermissible extraterritorial application of RICO because: (i) the RICO predicates at issue in this case are instances of mail fraud; (ii) the mail fraud statute only applies domestically; and (iii) a reasonable jury could not find that Grossman engaged in domestic conduct relevant to the "focus" of the mail fraud statute. *RJR Nabisco*, 136 S. Ct. at 2101. (*See, e.g.*, Def. RICO Br. 5 ("This case[] [is] cobbled together out of mail-fraud allegations[.]"); *id.* ("[T]here is no basis for finding … that the mail fraud statute appl[ies] extraterritorially." (internal quotation marks omitted)); *id.* ("This case … is a foreign dispute that is beyond the domestic focus of RICO.")).  To the extent Grossman is raising this argument, the Court now rejects it.

It is undisputed that the RICO predicates at issue here are violations of the mail fraud statute, 18 U.S.C. § 1341, and that the mail fraud statute only applies domestically.  (Def. RICO Br. 5; Pl. RICO Opp. 13).  *See European Cmty.* v. *RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) ("[W]e see no basis for finding a manifestation of congressional intent that the mail fraud statute apply extraterritorially."), *rev'd and remanded on other grounds*, 136 S. Ct. 2090.  Consequently, the Court must determine whether a reasonable jury could find that Grossman engaged in conduct relevant to the focus of the mail fraud statute.

The Second Circuit has held that the "essential elements" of mail fraud are: "[i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the mails … to further the scheme."  *United States* v. *Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004)).  Thus, the mail fraud statute forbids a particular class of frauds (i.e., frauds that are designed to take money or property, and that involve the U.S. mails).  These frauds are properly considered the "focus" of § 1341.[4]  *See Morrison*, 561 U.S. at 267 (suggesting that the "focus" of a statute is the set of transactions that the statute seeks to "regulate"); *Chevron Corp.* v. *Donziger*, 974 F. Supp. 2d 362, 571 (S.D.N.Y. 2014) (same).

It is not entirely clear what sort of domestic conduct is "relevant" to this statutory focus.  *RJR Nabisco*, 136 S. Ct. at 2101.  The Supreme Court and the Second Circuit have cautioned that minimal domestic conduct may not be "relevant" to a statute's focus, even if the conduct advances a plan to violate the statute.  *See Morrison*, 561 U.S. at 266 (explaining that the presumption against extraterritoriality applies even where "*some* domestic activity is involved

---

[4]     Some courts in other jurisdictions have suggested that the "focus" of § 1341 is the use of the U.S. mails.  *See, e.g.*, *United States* v. *Coffman*, 771 F. Supp. 2d 735, 738-39 (E.D. Ky. 2011).  But this Court is not convinced that the use of the U.S. mails, without more, can be considered conduct relevant to the "focus" of the mail fraud statute.  As its title indicates, § 1341, is aimed at "frauds and swindles."  To be sure, the statute addresses a limited set of "frauds and swindles" — namely, those involving the U.S. mails.  However, in singling out this type of fraud, Congress did not shift the focus of the statute away from fraud.  Rather, Congress narrowed the focus of the statute from all fraud to fraud facilitated by the U.S. mails.  Thus, the use of U.S. mails is a necessary but not sufficient condition for criminal liability under § 1341.  *Cf. Petroleos Mexicanos* v. *Conproca S.A. de C.V.*, 572 F. App'x 60, 61 (2d. Cir. 2014) (summary order) (finding no domestic violation of the wire fraud statute despite the fact that U.S. wires were used to further a fraud).

in [a] case"); *Petroleos Mexicanos* v. *Conproca S.A. de C.V.*, 572 F. App'x 60, 61 (2d Cir. 2014) (summary order) (holding that wire fraud can occur extraterritorially, even if money is wired from a U.S. bank in furtherance of a fraudulent scheme).  Thus, the Court believes that a defendant commits conduct "relevant" to the focus of the mail fraud statute only when: (i) the defendant commits a substantial amount of conduct in the United States; and (ii) the conduct is integral to the commission of a fraud; and (iii) at least some of the conduct involves the use of the U.S. mails.

Applying these principles, the Court believes that the record contains adequate evidence that Grossman committed a substantial amount of conduct in the United States, and the conduct was integral to the commission of his fraud.  Grossman testified that he specifically established IBIS — a New York Corporation — so that he could pay for the fraudulent subscription orders. (Tr. 348-50).  In addition, Grossman testified that IBIS had an "office" in Garden City, New York and that he occasionally received journals at this office, before redirecting them to Brazilian end users.  (*Id.* at 342, 348-50).  Without the use of IBIS and its office, Grossman's fraud would have been foiled by Brazilian regulations and, occasionally, by quirks in the Brazilian postal system.  (*Id.*).  *Cf. Chevron Corp.*, 974 F. Supp. 2d at 574-75 (finding that the defendants had violated criminal laws domestically in part because, "[a]bsent the[ir] U.S. activity ... [the fraud] ... would have been doomed to failure").  And as explained above, at least some of Grossman's conduct involved the use of U.S. mails: The fraudulent subscription orders at issue in this case were

26

mailed to Elsevier's office in the United States.  (*See, e.g.*, Ex. 12, 17, 23, 31, 34, 38, 42).  Thus, it is safe to say that Defendants committed domestic conduct relevant to the focus of the mail fraud statute.

It is important to note, however, that even if Defendants committed a substantial portion of their mail fraud in the United States, that does not necessarily mean that Plaintiffs were injured in the United States.  *See, e.g.*, *Pasquantino* v. *United States*, 544 U.S. 349, 371 (2005) (noting that defendants "execute[d]" a fraud in the United States, but the fraud caused injury to the Canadian Government — presumably in Canada).  For the reasons explained below, the Court does not believe Plaintiffs have proven that they suffered injury on U.S. soil.

> ### v.  Plaintiffs Did Not Plead or Prove a Domestic Injury to Business or Property

Grossman also contends that he is entitled to judgment as a matter of law on the RICO claim because Plaintiffs did not plead or prove a domestic injury to their "business or property."  18 U.S.C. § 1964(c).  (*See* Def. Supp. Br. 2-4).  The Court agrees.

> ### A.  Defining "Domestic Injury"

As Plaintiffs note, there is no established test for determining whether an injury to business or property occurs domestically.  (Pl. Supp. Br. 3-4).  *See also RJR Nabisco*, 136 S. Ct. at 2111 (declining to explain what constitutes a "domestic injury" in the RICO context).  However, Plaintiffs contend that this Court should look to the test that courts use to determine whether an antitrust

injury occurs within the United States.  (Pl. Supp. Br. 3-6).  Plaintiffs explain

that the Supreme Court has "often looked to antitrust law 'for guidance in

construing § 1964(c).'"  (*Id.* at 4 (quoting *RJR Nabisco*, 136 S. Ct. at 2109)).

And the Supreme Court has already defined "domestic injury" in the antitrust

context: Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15

U.S.C. § 6a, an antitrust injury is domestic in nature if it: "[i] sufficiently affects

American commerce, *i.e.*, it has a 'direct, substantial, and reasonably

foreseeable effect' on American domestic, import, or (certain) export commerce,

*and* [ii] has an effect of a kind that antitrust law considers harmful, *i.e.*, the

'effect' must 'giv[e] rise to a [Sherman Act] claim.'"  *F. Hoffmann-La Roche Ltd.* v.

*Empagran S.A.*, 542 U.S. 155, 162 (2004) (quoting 15 U.S.C. § 6a) (emphasis in

original).  Reasoning by analogy, Plaintiffs contend that, in the RICO context,

an individual has suffered a domestic injury if: "[a] pattern of racketeering

activity (i) ha[d] a 'direct, substantial, and reasonably foreseeable effect' on U.S.

commerce, and (ii) ha[d] an effect that g[ave] rise to a RICO claim."  (Pl. Supp.

Br. 6 (quoting *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 162)).

     The Court cannot accept Plaintiffs' proposed test.  While it is true that

the Supreme Court often looks to antitrust law for guidance in construing

RICO, the Court made plain in *RJR Nabisco* that antitrust statutes and RICO

provisions are "not … interchangeable."  136 S. Ct. at 2109.[5]  Precisely for this

---

[5]     *See also RJR Nabisco, Inc.* v. *European Cmty.*, __ U.S. __, 136 S. Ct. 2090, 2109-10
        (2016):

             There is good reason not to interpret § 1964(c) to cover foreign
             injuries just because the Clayton Act does so. When we held in

28

reason, the Supreme Court "ha[s] declined to transplant features of the Clayton Act's cause of action into the RICO context where doing so would be inappropriate." *Id.* And in this Court's view, it would be similarly inappropriate to model the test for "domestic injury" in the RICO context after the test for domestic injury in the antitrust context.

For a private plaintiff to recover damages from an antitrust violation, the plaintiff must allege that he or she sustained an "antitrust injury." *Brunswick*

---

[*Pfizer Inc.* v. *Government of India*, 434 U.S. 308 (1978)] that the Clayton Act allows recovery for foreign injuries, we relied first and foremost on the fact that the Clayton Act's definition of "person" — which in turn defines who may sue under that Act — "explicitly includes 'corporations and associations existing under or authorized by ... the laws of any foreign country.'" 434 U.S., at 313, 98 S. Ct. 584; *see* 15 U.S.C. § 12. RICO lacks the language that the *Pfizer* Court found critical. *See* 18 U.S.C. § 1961(3). To the extent that the *Pfizer* Court cited other factors that might apply to § 1964(c), they were not sufficient in themselves to show that the provision has extraterritorial effect. For example, the *Pfizer* Court, writing before we honed our extraterritoriality jurisprudence in *Morrison* and *Kiobel*, reasoned that Congress "[c]learly ... did not intend to make the [Clayton Act's] treble-damages remedy available only to consumers in our own country" because "the antitrust laws extend to trade 'with foreign nations' as well as among the several States of the Union." 434 U.S., at 313-314, 98 S. Ct. 584. But we have emphatically rejected reliance on such language, holding that "'even statutes ... that expressly refer to "foreign commerce" do not apply abroad.'" *Morrison*, 561 U.S., at 262-263, 130 S. Ct. 2869. This reasoning also fails to distinguish between extending substantive antitrust law to foreign conduct and extending a private right of action to foreign injuries, two separate issues that, as we have explained, raise distinct extraterritoriality problems. *See supra*, at 2105-2108. Finally, the *Pfizer* Court expressed concern that it would "defeat th[e] purposes" of the antitrust laws if a defendant could "escape full liability for his illegal actions." 434 U.S., at 314, 98 S. Ct. 584. But this justification was merely an attempt to "divin[e] what Congress would have wanted" had it considered the question of extraterritoriality — an approach we eschewed in *Morrison*, 561 U.S., at 261, 130 S. Ct. 2869. Given all this, and in particular the fact that RICO lacks the language that *Pfizer* found integral to its decision, we decline to extend this aspect of our Clayton Act jurisprudence to RICO's cause of action.

*Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  In other words, the plaintiff must allege an injury that "reflect[s] the anticompetitive effect" of the defendant's conduct or the acts made possible by the defendant's conduct.  *Id.* Because an "antitrust injury" is one that diminishes the competitive nature of a commercial market, it makes sense to say that an "antitrust injury" occurs domestically when it has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce.  *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 162.

By contrast, a private RICO plaintiff has broad latitude to allege *any* injury to her "business *or* property," so long as those injuries were caused by the defendant's commission of RICO predicates (and that the predicates were committed under circumstances giving rise to RICO liability).  *See* 18 U.S.C. § 1964; *see also Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 495 (1985).  Some of these injuries might be the kind of injuries that distort commercial markets, but others may not.  For example, imagine that the owner of a small company (operating in interstate commerce) extorts his landlord once a year to get a good deal on his rent.  If the company is small enough, the extortion might not have a "substantial" effect on U.S. commerce; nevertheless, it could still cause substantial harm to the landlord's business, and this seems to be the type of harm that § 1964 was designed to remedy.  *See Sedima*, 473 U.S. at 495 (discussing the broad remedial purposes of § 1964); *id.* (stating, categorically and without exception, that when a "defendant engages in a pattern of racketeering activity in a manner forbidden by [§ 1962], and the racketeering

30

activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)").

The Court concludes that, in the RICO context, courts should employ a more flexible inquiry to determine where an injury occurs. First, the court should determine what type of injury a RICO plaintiff has suffered. If the plaintiff has suffered an injury to his or her business, the court should ask where substantial negative business consequences occurred. By contrast, if the plaintiff has suffered an injury to his or her property, the court should ask where the plaintiff parted with the property or where the property was damaged.

### B.    The Injuries in This Case

The record indicates that Plaintiffs suffered two injuries from Defendants' pattern of racketeering activity: (i) their business suffered a competitive injury; and (ii) they parted with their property in reliance on Defendants' fraudulent statements.[6] Unfortunately for Plaintiffs, the evidence at trial indicates that neither of these injuries occurred on U.S. soil.

---

[6]    The Amended Complaint also alleges that Defendants deprived Plaintiffs of intellectual property — the names of the actual end users of the journals. At trial, however, Plaintiffs did not seek damages for the loss of this intellectual property. (*See* Tr. 438-39, 480-81). Instead, Plaintiffs requested damages that consisted of the difference between the price that certain (identified) Brazilian institutions should have paid for journal subscriptions, and the price that those institutions actually paid. (*See id.*). Consequently, the Court has not considered the alleged loss of intellectual property in its analysis. The Court notes for the record, however, that the loss of this intellectual property apparently occurred in Brazil, where Defendants falsified the names on their subscription forms.

31

### 1.   Competitive Injury

First, the record suggests that Plaintiffs suffered a competitive injury: Brazilian institutions purchased journal subscriptions from Defendants at a discounted rate, rather than purchasing them from Plaintiffs for the full institutional price.  However, all of the evidence in the record suggests that this injury occurred in Brazil.  (Def. Supp. Br. 2-4).  The journal subscriptions at issue in this case were ultimately sold to Brazilian institutions (*see* Ex. 7), and there is no evidence suggesting that Defendants ever sold or attempted to sell journals to institutions outside of Brazil.  Nor is there any evidence that the market for journals in Brazil is so closely intertwined with the market for journals in other countries that disruptions in the Brazilian market would have an effect on the price or quantity of journals sold to institutions in other countries.  Thus, the Court cannot say that Plaintiffs suffered any negative business consequences in any country but Brazil.  *Cf., e.g.*, *Darby Trading Inc.* v. *Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 336-37 (S.D.N.Y. 2008) (suggesting, in the personal jurisdiction context, that injury to a plaintiff's business occurs in New York when the plaintiff loses sales and customers "in the New York market"); *Energy Brands Inc.* v. *Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) (same).

Plaintiffs seem to suggest that the racketeering activity in this case affected their U.S. business because: (i) Defendants placed their fraudulent subscription orders from the United States; and (ii) some of the journals at

issue in this case were mailed to Grossman's apartment in Garden City, New York.  (Pl. Supp. Br. 6-9).  Neither of these contentions has merit.

Turning to the first contention, Plaintiffs argue that Grossman established IBIS so that he could transfer money from Brazil to the United States; thus, it is fair to presume that IBIS placed fraudulent subscription orders (on behalf of the enterprise) from the United States.  (Pl. Supp. Br. 6-7). According to Plaintiffs, this presumption is "borne out by the documentary evidence, which reflects that … 38 out of the 51 fraudulent subscriptions [at issue here] were purchased with an IBIS check, issued by IBIS and drawn upon IBIS's checking account maintained with JP Morgan Chase through a New York-based branch."  (Pl. Supp. Br. 7).

As an initial matter, the Court cannot conclude that Grossman, IBIS, or any other Defendant falsified subscription orders in the United States simply because Defendants paid for those subscriptions with checks drawn on a U.S. bank account.  *Cf. Petroleos Mexicanos*, 572 F. App'x at 61 (holding that wire fraud occurred outside the United States, even though defendants caused money to be wired from a U.S. bank account).  At trial, Grossman testified that PTI employees in Brazil filled out the subscription forms, and these PTI employees simply funneled money through the IBIS account.  (*See* Tr. 348-50). This testimony is consistent with the representations that Plaintiffs made to this Court in connection with their application for a writ of attachment.  (*See* Dkt. #156 at 7 (Plaintiffs explaining that the subscription orders at issue in this case were "placed by PTI" and that "in a real sense," the funds in the IBIS

33

account were "PTI funds")).  Thus, the Court will not now countenance an argument that IBIS, as an entity independent from PTI, was falsifying order forms from the United States on behalf of various clients.  *See Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485-86 (2d Cir. 2014) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (quoting *Pegram* v. *Herdrich*, 530 U.S. 211, 227 n.8 (2000))).

However, even if the fraudulent subscriptions were ordered from the United States, it does not follow that Plaintiffs were injured in the United States.  The Second Circuit has recognized (albeit in a different context) that it is possible for fraudulent conduct to take place in one location, but cause injury in another location.  *See Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791-92 (2d Cir. 1999).  Similarly, the Supreme Court has indicated that fraudulent conduct in the United States can cause harm to foreign governments, presumably on foreign soil.  *See Pasquantino*, 544 U.S. at 371.  Thus, even if Defendants falsified subscription orders on U.S. soil, Plaintiffs still have to prove that the falsified subscription orders had some effect on Plaintiffs' relationships with actual or prospective U.S. customers.  But there is no such proof in the record.  Rather, as discussed above, the record suggests that Defendants' conduct only affected Plaintiffs' relationships with Brazilian institutions.

Alternatively, Plaintiffs contend that Defendants' conduct affected their U.S. business because some of the journals at issue in this case were mailed to

Grossman's apartment in Garden City, New York. (Pl. Supp. Br. 8-9). However, the record indicates that the journals were never used in New York; instead, they were received at the Garden City apartment, which acted as a sort of postal station in Defendants' enterprise, and then shipped on to Brazilian institutions. (*See* Tr. 322 (Pitts testifying that "PTI [was] consolidating subscriptions in the U.S. at [the] U.S. addresses. They were then being sent down to Brazil and they were being sold in Brazil."); *id.* at 348-50 (Grossman testifying that he sometimes used the Garden City apartment as a shipping address for orders placed on behalf of Brazilian customers if he believed that "the Post Office [wouldn't] work in Brazil for delivery")). Consequently, Plaintiffs have failed to show that Defendants' conduct affected the market for Plaintiffs' products in any country other than Brazil.[7]

## 2.    Parting with Property Under False Pretenses

Plaintiffs were also injured when they parted with their journals in reliance on Defendants' fraudulent statements. *Cf., e.g.*, *Bank Brussels Lambert*, 171 F.3d at 792 (noting that a plaintiff is injured when he or she parts with money in reliance on fraudulent statements); *accord Hargrave* v. *Oki Nursery, Inc.*, 636 F.2d 897, 900 (2d Cir. 1980); *Palace Expl. Co.* v. *Petroleum Dev. Co.*, 41 F. Supp. 2d 427, 435-36 (S.D.N.Y. 1998). The evidence introduced at trial suggests that Plaintiffs parted with their journals, in exchange for a

---

[7]    Thus, even if the Court had accepted Plaintiffs' proposed test for a domestic RICO injury, the Court would not have found that Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

relatively modest amount of money, because they believed Defendants'
statements that the journals would be used by individuals; had Plaintiffs
known that the journals would be given to institutions, they would not have
parted with the journals for such a low price.  (*See* Tr. 151-53).

To determine whether this injury occurred domestically, the Court must
determine where Plaintiffs parted with the journals at issue in this case.
Plaintiffs claim in their supplemental briefing that they parted with the
journals in the United States.  (*See* Pl. Supp. Br. 10 ("Elsevier relied on
[Defendants'] fraudulent subscriptions in the United States by issuing journals
for the discounted individual price[.]"))  But the evidence in the record does not
support this assertion.  While Guman testified that Plaintiffs' journals are "sent
via the post," he did not specify that the journals were sent through the
*American* postal service, or otherwise suggest that Plaintiffs shipped their
products from the United States.  More importantly, the record contains some
indications that Plaintiffs parted with the journals in the Netherlands.  Thirteen
of the invoices that Plaintiffs submitted to the jury indicate that the "shipping
method" for the journals that Plaintiffs sent to Defendants was "Dutch
PTT/Stan."  (Ex. 11, 14-15, 19-22, 24, 27-28, 37, 39, 40).[8]  This strongly
suggests that the journals (or at least the journals described in those 13
invoices) were mailed through the Dutch PTT (the Dutch postal service).  It is

---

[8]     A fourteenth invoice lists "DHL Omega" as the shipping method for some of the journals
that Defendants ordered.  (Ex. 35).  While DHL is a German shipping company, it has
operations all over the world; consequently, that particular shipping designation does
not provide much insight.

not clear why Plaintiffs would use the Dutch postal service to ship journals to addresses in New York and Brazil unless Plaintiffs were sending journals *from* the Netherlands to the United States and Brazil.  Thus, there is reason to believe that the journals left Plaintiffs' control in the Netherlands.

The Court is sensitive to the concern that, when a court determines where a corporation parts with its goods, the court should look to the place where corporate employees authorize the shipment of goods, rather than the place where the goods happen to be stored.  Consequently, if Plaintiffs could demonstrate that a U.S. employee authorized warehouse workers (in the Netherlands or elsewhere) to ship journals to Defendants, it might be fair to say that Plaintiffs parted with those journals in the United States.  But the record does not show that a U.S. employee authorized the shipments at issue in this case.  Guman testified that, when Plaintiffs receive subscription orders, the orders are "actually process[ed]" through a "[f]ulfillment system."  (Tr. 165). Plaintiffs maintain four different fulfillment systems (Tr. 170), but it is not clear where those fulfillment systems are located.  And the record indicates that at least some of the fulfillment systems that processed Defendants' fraudulent subscription orders were located abroad: 14 of the invoices include a line that reads, "Registered in England Number 1982084 Elsevier, Fulfillment Centre, The Boulevard, Kidlington, Oxford, OX5, 1GB UK."  (Ex. 11, 14-15, 19-22, 24, 27-28, 35, 37, 39-40).  At the same time, the evidence suggests that some of the subscriptions that PTI ordered were processed by a fulfillment center called "Elsevier France."  (*See* Ex. 4).  Thus, there is reason to believe that, for at least

some of the subscriptions at issue here, the employees who authorized the shipment of the journals were located at fulfillment centers in England or France.  The record does not provide any analogous indication that employees who authorized the shipment of other journals were located in the United States.

Plaintiffs ask the Court to infer that they parted with their journals in the United States because Defendants mailed their fraudulent subscription orders and their checks to an address in the United States.  (*See* Pl. Supp. Br. 10). But the Court cannot draw such an inference, even with the generous prism through which Plaintiffs' trial evidence must be viewed.  The evidence submitted at trial is fully consistent with a scenario in which: (i) Plaintiffs received subscription orders and checks in the United States; (ii) a customer service representative in the United States notified a foreign fulfillment center that the order and the payment had been received; and then (iii) an employee at a foreign fulfillment center authorized the shipment of journals to the customers.  (*See* Tr. 166 (explaining that "information that's in [a] fulfillment system[] … come[s] from [a] customer service representative that actually takes the order")).  As noted above, while Defendants sent their checks and orders to U.S. addresses, it appears that the bulk of the orders were processed by foreign fulfillment systems.  Furthermore, the record reveals that, when Defendants ordered some of their subscriptions, they had a choice between mailing a check to the United States and wiring the money directly to Plaintiffs' bank account in the Netherlands.  (*See* Ex. 11, 14-15, 19-22, 24, 28, 35).  This suggests that

Defendants were not dealing solely with the American arm of Plaintiffs'
publishing business; they were dealing with an integrated, international
publishing operation.  Consequently, there is not enough evidence in the record
for a reasonable jury to conclude that a U.S. employee provided final
authorization to ship journals to Defendants.[9]

### 3.    The Potential Remedy of a New Trial

Plaintiffs' supplemental brief contends that, to the extent Plaintiffs have
failed to prove that they suffered a domestic injury, they are entitled to a new
trial under Federal Rule of Civil Procedure 59.  (Pl. Supp. Br. 17-18).  Rule 59
gives a court discretion to "grant a new trial on all or some of the issues" in a
case "for any reason for which a new trial has heretofore been granted in an
action at law in federal court."  Fed. R. Civ. P. 59.  The Second Circuit has
recognized that an "intervening change in controlling law" can be an
appropriate basis for granting a new trial under Rule 59.  *LiButti* v. *United*

---

[9]    It is true that, for at least some of the journals that Elsevier sent to Plaintiffs, "[l]egal
and beneficial title" to the journals "remain[ed] with Elsevier until Elsevier ha[d]
received in full (in cash or cleared funds) all sums due [for the journals]."  (Ex. 11, 13-
16,19-20, 22, 24, 27-28, 32-33, 35, 37, 39-40, 43).  Because Plaintiffs sent their checks
to U.S. addresses, a reasonable jury might be able to infer that Elsevier cashed or
cleared those checks in the United States.  In other words, a reasonable jury might be
able to infer that *title* to the disputed journals passed from Plaintiffs to Defendants in
the United States.  But this does not change the Court's analysis.  Before title passed to
Defendants, Plaintiffs did not have possession of the journals, but they did have a right
to sue Defendants to recover (i) the journals themselves or (ii) damages from
Defendants' use of the journals (in derogation of Plaintiffs' title).  After title passed to
Defendants, Plaintiffs were in exactly the same position: Plaintiffs did not have
possession of the journals, but they did have a right to sue Defendants to recover the
journals or damages from Defendants' use of the journals (in derogation of the
contractual promise that the journals were for "valid personal use").  As the change of
title made no practical difference to Plaintiffs, the Court believes that Plaintiffs were
injured when they lost possession of the journals, rather than when they lost title to the
journals.

*States*, 178 F.3d 114, 119 (2d Cir. 1999); *see also Sass* v. *MTA Bus Co.*, 6 F.

Supp. 3d 229, 238 (E.D.N.Y.), *adhered to on reconsideration*, 6 F. Supp. 3d 238

(E.D.N.Y. 2014) (granting a new trial based on a change in the governing law).

At the time of trial in this case, there was no requirement that a RICO

plaintiff plead or prove domestic injury to business or property.  See *RJR*

*Nabisco*, 136 S. Ct. at 2106 (noting that, prior to the Supreme Court's decision

on June 20, 2016, "[t]he Second Circuit thought that the presumption against

extraterritoriality did not apply to § 1964(c)").  Furthermore, even if Plaintiffs

wanted to hedge their bets at trial by introducing evidence regarding domestic

injury — in case the Supreme Court ruling created a domestic injury

requirement — they may not have known what evidence to introduce.  Now

that this Court has offered some guidance on the proof required to establish a

domestic injury, Plaintiffs would like an opportunity to show that they suffered

a qualifying injury on U.S. soil.  (*See* Pl. Supp. Br. 17-18).

The difficulty with Plaintiffs' request is that they have conceded that the

"Amended Complaint did not explicitly plead a domestic injury to business or

property." (Pl. Supp. Br. 11).  And the Court does not believe that, at this point

in the proceedings, it can allow Plaintiffs to correct the deficiency in its

pleadings.  Federal Rule of Civil Procedure 15(b)(2) provides that a court may

allow a party may amend its pleadings "after trial" if the amendment:

(i) addresses an issue that was "tried by the parties' express or implied

consent"; or (ii) allows a party to "conform [the pleadings] to the evidence"

presented to the jury.  *See also Hillburn by Hillburn* v. *Maher*, 795 F.2d 252,

264 (2d Cir. 1986) ("[I]f the [Rule 15(b)] motion is made after trial, and the issues have not been tried with the express or implied consent of the parties, the motion may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment and should be granted in the absence of such prejudice if the interests of justice so require."); *Browning Debenture Holders' Comm.* v. *DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977) ("The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record.").  Here, the Court does not believe that the issue of domestic injury was "tried by the parties' express or implied consent"; and even if the parties consented to try the issue, Plaintiffs lost that trial for the reasons outlined above.  Similarly, allowing Plaintiffs to plead domestic injury would not simply conform the pleadings to the evidence introduced at trial (because, at the risk of beating a dead horse, the trial evidence did not establish a domestic injury).

Thus, the Court must consider whether it may order a new trial under Rule 59, limited to the issue of domestic injury, and then — if Plaintiffs prove that they in fact suffered a domestic injury — allow Plaintiffs to amend their pleadings to "conform them to the evidence" introduced at the new trial.  The Court believes that it is permissible to proceed in this manner for two reasons.

First, nothing in Rule 59 limits this Court's discretion to grant a new trial on an issue that has not been pleaded, if doing so is necessary to prevent a miscarriage of justice.  *See Hygh* v. *Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992)

41

(noting that a trial court has discretion to grant Rule 59 motions to avoid a "miscarriage of justice" (internal quotation marks omitted)); *Fioto* v. *Manhattan Woods Golf Enterprises, LLC.,* 304 F. Supp. 2d 541, 545 (S.D.N.Y. 2004), *aff'd sub nom. Fioto* v. *Manhattan Woods Enterprises LLC,* 123 F. App'x 26 (2d Cir. 2005) (summary order) (same).  And the Court believes that it would be a miscarriage of justice to throw out Plaintiff's RICO claim against Grossman — after four years of litigation — because Plaintiffs failed to introduce evidence (of a domestic injury) that had been deemed unnecessary by the Second Circuit. *See European Cmty.* v. *RJR Nabisco, Inc.,* 764 F.3d at 151 (rejecting the idea that § 1964 imposes a domestic injury requirement); *cf. Hawknet, Ltd.* v. *Overseas Shipping Agencies,* 590 F.3d 87, 91-92 (2d Cir. 2009) (holding that a defendant had not waived an argument that it failed to make in the district court because the argument "would have been directly contrary to controlling precedent in this Circuit" at the time of trial).  Under these circumstances, justice demands that Plaintiffs be given some opportunity introduce evidence regarding the location of their injury.  *Cf. Sass,* 6 F. Supp. 3d at 238 (granting a Rule 59 motion after the Supreme Court changed the standard of proof for Title VII cases).

Second, and relatedly, Rule 15(b) was specifically designed to avoid the "tyranny" of a formalistic system that prioritized perfection in pleading over practical assurances that litigants had a fair opportunity to try their disputes. 6A Charles A. Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1491 (3d ed.); *see also Hillburn,* 795 F.2d at 264 (explaining that the use of Rule 15(b) to

42

amend pleadings after trial "should be granted in the absence of ... prejudice [to any party] ... if the interests of justice so require"). Thus, the Court will not read Rule 15 to prevent it from holding a full and fair trial on the unpleaded domestic injury issue, and then amending the pleadings to conform to the evidence introduced at that trial.

While the Court believes that it would be permissible to order a new trial on the issue of domestic injury at this juncture, it does not believe that it would be advisable to hold a second trial unless Plaintiffs are capable of introducing more information on the issue of domestic injury. Thus, at this point, the Court will grant Grossman's Rule 50 motion for judgment as a matter of law and deny Plaintiffs' Rule 59 motion for a new trial without prejudice: Plaintiffs may renew their Rule 59 motion within 30 days if the motion is accompanied by a proffer of the evidence that would be offered at a trial on the issue of domestic injury.

### 2.    Consistency of the Verdicts

While Grossman did not raise the issue of inconsistent verdicts in his post-trial motions, the Court was troubled by the apparent inconsistency between the jury's responses to some of the questions on the verdict form. Question 4 of the verdict form asked:

> With respect to Count Four (conversion), have the plaintiffs proven by a preponderance of the evidence that (i) the plaintiffs had legal ownership or a possessory right or interest in the property (*here, the lost subscription revenues*); and (ii) [Grossman] exercised unauthorized domain over the property or interfered with it in derogation of the plaintiffs' rights?"

43

(Dkt. #167 (emphasis added)). The jury answered this question in the affirmative. (*Id.*). As a result, the jury proceeded to answer question 4(a), which asked:

> [D]o you find that the plaintiffs sustained damages — *in the form of lost subscription revenues* — as a proximate consequence of [Grossman's] conversion of the property?

(*Id.* (emphasis added)). The jury answered this question in the negative. (*Id.*). Thus, the Court became concerned that the jury had espoused two irreconcilable factual conclusions: a conclusion that Grossman had impermissibly taken Plaintiffs' subscription revenues, and a conclusion that Grossman's conduct had not caused any damage "in the form of lost subscription revenues." The Court was further concerned that, if the jury had espoused these two factually inconsistent positions, a new trial might be required on some or all of the counts in the Amended Complaint. *See, e.g.*, *Munafo* v. *Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) ("[I]nconsistent special verdict answers raise constitutional concerns because 'proper deference to the parties' Seventh Amendment rights to trial by jury precludes entry of a judgment that disregards any material jury finding.'" (quoting *Tolbert* v. *Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001)). As a result, the Court solicited supplemental briefing from the parties, asking whether the Court could consider the issue of inconsistent verdicts *sua sponte* (particularly in light of Grossman's *pro se* status), and whether the jury's responses to any questions on the verdict form were in fact irreconcilably inconsistent. (Dkt. #211).

It is not clear whether the Court can consider the issue of inconsistent verdicts *sua sponte* because Grossman is proceeding *pro se*. *Compare Cash*, 654 F.3d at 342 (explaining, in a case with counseled parties, that a party "waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict" before the court excuses the jury (internal quotation marks omitted)), *with Denny* v. *Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir. 1994) (suggesting a "case-by-case application" of waiver principles in cases involving inconsistent jury verdicts). However, to the extent the Court can consider questions regarding inconsistent verdicts, it concludes that the jury's responses to the questions on the verdict form were *not* irreconcilably inconsistent.

> ### a. The Jury's Verdicts on Question 4 and Question 4(a) Can Be Reconciled with One Another and with the Jury's Other Verdicts

A court cannot set aside an otherwise valid jury verdict unless the jury's answers to special verdict questions are "*ineluctably* inconsistent." *Munafo*, 381 F.3d at 105 (quoting *Tolbert,* 242 F.3d at 74) (emphasis in *Munafo*). "In cases 'where the special verdict answers appear to be inconsistent but there is a view of the case that makes the jury's answers consistent, they must be resolved that way.'" *Id.* (quoting *Tolbert,* 242 F.3d at 74); *accord Cash*, 654 F.3d at 343.

In this case, Plaintiffs have proposed a view of the case that harmonizes the jury's responses to Questions 4 and 4(a): The jury believed that Grossman improperly converted Plaintiffs' subscription revenues, as they indicated in

their response to Question 4.  However, the jury also wanted to heed the Court's instruction that it is improper to "award compensatory damages more than once for the same injury."  (Tr. 481).  The jury likely believed that they had already compensated Plaintiffs for the loss of their subscription revenues (either with the damages they awarded on the RICO claim or the damages they awarded on the breach-of-contract claim).  Consequently, they decided not to compensate Plaintiffs again by awarding damages on the conversion claim, as reflected in the response to Question 4(a).  Taking this view of the case, there is no inconsistency between any of the jury's factual findings.  (*See* Pl. Supp. Br. 21)

> ### b.   The Jury's Verdicts on the Substantive RICO Count and the RICO Conspiracy Count Can Be Reconciled

In his supplemental brief to the Court, Grossman did not focus his arguments on the potential inconsistency between Questions 4 and 4(a), choosing instead to focus on a perceived inconsistency between the Jury's answer to Question 1 and Question 2.  Question 1 asked:

> With respect to Count One (RICO), have the plaintiffs proven by a preponderance of the evidence that (i) an enterprise existed; (ii) the enterprise affected interstate or foreign commerce; (iii) the defendant was associated with or employed by the enterprise; (iv) the defendant engaged in a pattern of racketeering activity; and (v) the defendant conducted, or participated in the conduct of, the enterprise through that pattern of racketeering activity?

(Dkt. #167).  The jury's answer to this question was "yes."  (*Id.*).  By contrast, Question 2 asked:

46

> With respect to Count Two (RICO conspiracy), have the plaintiffs proven by a preponderance of the evidence that (i) there was an agreement between two or more persons or entities to participate in an enterprise that would affect interstate or foreign commerce through a pattern of racketeering activity; (ii) the defendant knowingly and willfully became a member of that agreement; and (iii) the defendant or another member of the conspiracy agreed to commit two racketeering acts?

(*Id.*).  The jury's answer to this question was "no." (*Id.*).

Grossman argues that, on the facts of this case, the jury's responses to these two questions were irreconcilably inconsistent.  (Def. Supp. Br. 5-7).  As Grossman explains, the RICO enterprise at issue here was an association-in-fact between and among Grossman, Roberto Saad, and PTI/IBIS.  However, "[w]ithout a RICO conspiracy — an 'agreement … to participate in [the] enterprise' — " this association in fact could not have existed.  (*Id.* at 5 (quoting Tr. 472)).  As a result, Grossman concludes, it was inconsistent for the jury to find that Grossman was "associated with or employed by an enterprise," but not liable for a RICO consistency.  (*Id.* at 5-7).  The Court disagrees.

Based on the record here, the jury could have determined that Grossman, Roberto Saad, and other PTI/IBIS employees agreed to form an enterprise (namely, a subscription business), but that they did *not* agree to conduct the enterprise's affairs through a pattern of racketeering.  Instead, Grossman made a unilateral decision to conduct (at least some) subscription sales in a fraudulent manner.  Such a situation would give rise to substantive RICO liability, but not liability for participating in a RICO conspiracy.

*Cf. United States* v. *Sessa*, 125 F.3d 68, 71 (2d Cir. 1997) ("There are significant distinctions between the proof necessary to show that a defendant conspired to violate RICO and the evidence required to prove an actual violation of that statute" (internal quotation marks omitted)).[10]

### 3.    The Court Denies Plaintiffs' Damages Motion

Because the Court has concluded at this juncture that Plaintiffs have failed to establish RICO liability, their request for judgment as a matter of law, or in the alternative, a new trial solely on the issue of RICO damages, must be denied.

### 4.    The Court Grants in Part and Denies in Part Plaintiffs' Motion for Final Default Judgment

Plaintiffs' Motion for Final Default Judgment against PTI and IBIS is denied as to the RICO claim and the RICO conspiracy claim, but granted as to the breach-of-contract claim.

### a.    The RICO and RICO Conspiracy Claims

Plaintiffs cannot obtain final default judgment on the RICO claim or the RICO conspiracy claim because they have admitted that the "Amended Complaint d[oes] not explicitly plead a domestic injury to business or property." (Pl. Supp. Br. 11).  In other words, Plaintiffs have admitted that, under current law, the Amended Complaint does not state a RICO claim.  This Court cannot

---

[10]    Because the Court has resolved the questions on the jury's verdict form, it need not consider Plaintiffs' alternative argument that the questions on the Court's verdict form should be characterized as general verdict questions, rather than special verdict questions, and that inconsistency between general verdicts does not ordinarily require retrial.  (*See* Pl. Supp. Br. 19-20 (citing *Cash* v. *County of Erie*, 654 F.3d 324, 343 (2d Cir. 2011))).  However, the Court believes that this argument has considerable force.

enter final judgment based on a defective pleading.  *See Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds* v. *Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) ("*Cement & Concrete Workers*") (explaining that "a party's default is deemed to constitute a concession of all well pleaded allegations of liability" (internal quotation marks omitted)).  And the Court is not obligated to do so merely because it entered a non-final default judgment in May of 2015. (*See* Dkt. #80).  *See also* Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

However, because Plaintiffs have not yet been to trial against PTI and IBIS, the Court will not dismiss the RICO and RICO conspiracy claims against PTI and IBIS outright; instead, within 30 days of the date of this Order, Plaintiffs may apply for leave to amend their pleadings (against PTI and IBIS) to allege domestic injury to business or property.  *See* Fed. R. Civ. P. 15(a)(2) (providing that, before trial, a court should "freely give leave [to amend the pleadings] when justice so requires"); *supra* at 42-43 (explaining why Plaintiffs

should be given an opportunity to plead and prove a domestic injury to business or property).

###       b.       The Breach-of-Contract Claim

Plaintiffs' Motion for Final Default Judgment against PTI and IBIS on the breach-of-contract claim is granted.  Because the Court believes that the breach-of-contracts claim is well pleaded, PTI's and IBIS's defaults are tantamount to admissions of liability on those claims.  *See Cement & Concrete Workers*, 699 F.3d at 234.  More specifically, they are tantamount to admissions that PTI and IBIS violated the terms of the subscription contracts listed in the Amended Complaint, Exhibit A.

For some of the subscription contracts described in Exhibit A, Plaintiffs state that they are not seeking damages.  For example, Plaintiffs candidly admit that, following discovery, Plaintiffs no longer believe that the subscription contracts listed in "Ex. A, lines 10[] [and] 16-31" are fraudulent. (Pl. Default Br. 10, n.4).  In addition, Plaintiffs state that they are not seeking damages for fraudulent subscription contracts that were personally signed by Grossman.  (*Id.* at 15-16).  Thus, Plaintiffs are only seeking damages with respect to 28 of the subscription contracts in Exhibit A.  (*See* Am. Compl., Ex. A, lines 2-7, 9, 11, 13-15, 33-41, 43-44, 46-51 (hereafter, the "Exhibit A subscriptions")).

Plaintiffs also attempt to seek contract damages for "eight additional personal rate subscriptions that corresponded to institutional rate subscriptions listed on the defendants' 148-page spreadsheet. [*See* Trial

Ex. 10, lines 45-52.].” (Pl. Default Br. 10, n.4). But Plaintiffs cannot obtain damages with respect to contracts that were not mentioned anywhere in the Amended Complaint. PTI's and IBIS's defaults were only tantamount to admissions that they breached the contracts described in the Amended Complaint; they were *not* tantamount to admissions that they breached any other contracts (such as the eight additional contracts that Plaintiffs identified during discovery), and if Plaintiffs would like to seek damages related to these eight additional contracts, they will have to bring a new civil suit.

Consequently, the Court must determine how much Plaintiffs are owed for violations of the 28 Exhibit A subscriptions (and only those subscriptions). The Court will calculate these damages by taking the full institutional price that PTI and IBIS should have paid for the subscriptions, and subtracting the discounted individual price that PTI and IBIS actually paid. (*See* Ex. 10 (listing the institutional price and the individual price for many subscriptions, including the 28 subscriptions at issue here)). Using this method, the Court has determined that PTI and IBIS owe $22,854 in damages.

Consequently, Plaintiffs now have a final default judgment against PTI and IBIS, based on the breach-of-contract claim in the Amended Complaint, in the amount of $22,854, plus prejudgment interest. *See* N.Y.C.P.L.R. § 5001. Within 30 days of the date of this Opinion and Order, the parties must submit their proposed interest calculations to the Court.

### 5.    The Court Denies Plaintiffs' Fee Motion

Because Plaintiffs have not prevailed on any RICO claim, the Fee Motion is denied, though it may be renewed depending on the resolution of subsequent motion practice.

### CONCLUSION

For the foregoing reasons, the RICO Motion is granted; the Damages Motion is denied; the Motion for Final Default Judgment is granted in part and denied in part; and the Fee Motion is denied.  If Plaintiffs wish to file a renewed motion for a new trial against Defendant Grossman under Rule 59, or for leave to amend the pleadings as to PTI or IBIS under Rule 15, they may do so within 30 days.  In addition, the parties must submit their proposed interest calculations to the Court within 30 days.  The parties are directed to appear for a telephone conference on **August 16, 2016, at 10:00 a.m.** to discuss the next steps in this case.

The Clerk of Court is directed to terminate the motions at docket entries 185, 187, 189, and 192.

SO ORDERED.

Dated:    August 4, 2016
          New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

*A copy of this Order was mailed by Chambers to:*

Pierre Grossman
100 Hilton Ave
Unit M23
Garden City, NY 11530